**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| William Maynes | : | |
| | : | |
| Plaintiff | : | C.A. NO.: 04-276T |
| | : | |
| v. | : | |
| | : | |
| Arthur Burton, et al | : | |
| | : | |
| Defendants | : | June 30, 2005 |

**MOTION TO COMPEL AND MOTION FOR CONTEMPT PURSUANT TO RULES 37 AND 45 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

For reasons more particularly explained in the appended Memorandum, the plaintiff hereby moves for an order of compliance pursuant to F.R.C.P. 37 (2)(B) and for a finding of contempt pursuant to F.R.C.P. 45.

The undersigned hereby certifies that he has in good faith conferred or attempted to confer with the person or party failing to make discovery in an effort to secure the information or material without court action.

**MICHAEL BRADLEY** • *ATTORNEY AT LAW*
39 GROVE AVENUE • WESTERLY, RHODE ISLAND 02891 • (401) 596-0808 • JURIS NO. 305353 • R.I. CODE 3551

THE PLAINTIFF
WILLIAM MAYNES

BY HIS ATTORNEY

Charles Michael Bradley
39 Grove Ave.
Westerly, RI 02891
(401) 596-0808
Fed. Bar No.: 3551

**CERTIFICATION**

I hereby certify that a copy of the foregoing *Motion to Compel and Motion for Contempt Pursuant to Rules 37 and 45 of the Federal Rules of Civil Procedure with appended Memorandum of Law* was mailed this 3d day of June, 2005 to the following counsel of record:

Attorney Michael J. Colucci
Olenn & Penza, LLP
530 Greenwich Ave.
Warwick, RI 02886

Charles Michael Bradley

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| William Maynes | : | |
| | : | |
| Plaintiff | : | C.A. NO.: 04-276T |
| | : | |
| vi. | : | |
| | : | |
| Arthur Burton, et al | : | |
| | : | |
| Defendants | : | June 30, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF'S MOTION TO COMPEL AND MOTION FOR CONTEMPT PURSUANT TO RULES 37 AND 45 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

## I. Factual Background:

On December 27, 2003, the plaintiff, William Maynes, (hereinafter "Maynes") was operating his red Jeep Wrangler plate number "M A Y N E S" in Westerly, Rhode Island when he was pulled over by the defendant, Arthur Burton (hereinafter "Burton"), a Westerly police officer. Burton suggested to Maynes several reasons supporting the stop which, in Maynes' view, seemed suspicious and contrived. Burton requested and received Maynes' license, registration and proof of insurance from him but shortly thereafter inexplicably started screaming at Maynes that Maynes was not complying with his directives.

The defendant, James Campbell (hereinafter "Campbell"), another Westerly Police officer, arrived on the scene shortly thereafter and he too commenced immediately to begin

screaming at Maynes, accusing Maynes of "putting one over on him" last time Maynes was stopped by Campbell.

Burton had already taken Maynes' wallet and searched it. Burton handcuffed Maynes and locked him in Burton's cruiser while Burton and Campbell searched Maynes' Jeep, but not before Burton, in the process of violently pulling Maynes' hands behind him in order to handcuff him, injured Maynes' shoulder seriously enough to subsequently require surgery.

Discovery in this case indicates that Burton and Campbell spoke on their cell phones to each other four minutes before someone ran a check on Maynes' license and registration from an on board computer in a Westerly Police cruiser and that the check was run twenty seven minutes prior to Burton's stop of the Maynes vehicle. It is also clear that Burton and Campbell spoke on cell phones at the time of the stop. Campbell had told a supervisor that he arrived on the scene after hearing Burton call the stop in to the dispatcher on the radio but no such call was made until forty minutes after the stop was over and Maynes had gone to the station to complain. At that time, a supervisor instructed Burton to call in the stop to establish a record of it.

The stop appears to have been pretextual. Campbell has admitted that he asked the plaintiff if the plaintiff hadn't "put one over on him" in another traffic stop the prior May.

**MICHAEL BRADLEY** • *ATTORNEY AT LAW*
39 GROVE AVENUE • WESTERLY, RHODE ISLAND 02891 • (401) 596-0808 • JURIS NO. 305353 • R.I. CODE 3551

Subsequent to the stop of Maynes, Maynes went into the Westerly Police Department to file a citizen's complaint. Sergeant Shawn Lacey handled part of the investigation. He interviewed Maynes and the two officers. He wrote no report of the interview with Maynes until 2 ½ months after the interview and only did so at the behest of a supervisor who informed him that a complaint had been filed by Maynes in the Town Hall, referring to the notice of Maynes' claim that was filed with the Town Clerk pursuant to Section 45-15-5 of the Rhode Island General Laws. Lacey took no notes of his interviews with Burton and Campbell. He destroyed the notes he took of his interview with Maynes after he wrote his report. His report is attached as Exhibit "A".

In his report, Lacey suggests in several places that Maynes either admitted that he gave Burton and Campbell permission to search his car and wallet, or at least would not disagree with those averments by the officers.

Maynes categorically denies that he gave Burton and Campbell permission to do anything that would otherwise have violated his Fourth Amendment rights.

By virtue of his report, Lacey is thrust directly into the middle of this case and his credibility is going to be questioned. The undersigned has established the following relevant information in discovery. Westerly Police Chief Edward Mello has admitted in his deposition

that Lacey is being investigated by the Rhode Island State Police with reference to his dealings with Renato Garcia, a/k/a Renskip Auto Sales, Inc.

At Lacey's deposition on June 8, 2005, he was instructed by Attorney Colucci to refuse to answer any questions about this investigation or his dealings with Renskip/Garcia. He also was instructed not to comply with the subpoena of the plaintiff instructing him to bring materials related to the transaction with him to the deposition. The subpoena served upon Lacey is attached as Exhibit "B". The pertinent part of Lacey's deposition is appended and marked as Exhibit "C".

A review of the court file in a civil suit involving a fire at Lacey's house indicates that Lacey received $51,000 for the Porsche that was ruined in the fire.

A document received in discovery from the Rhode Island Department of Motor Vehicles (attached and marked as Exhibit "D") would suggest that Lacey paid Renato Garcia/Renskip Auto approximately $8,000 for the vehicle, although further inquiry about this was precluded by Attorney Colucci's instructions to Lacey to refuse to answer any questions related to his Porsche purchase in the deposition.

**MICHAEL BRADLEY** • *ATTORNEY AT LAW*
39 GROVE AVENUE • WESTERLY, RHODE ISLAND 02891 • (401) 596-0808 • JURIS NO. 305353 • R.I. CODE 3551

## II. Law:

Fed. Rule Civ. P. 608 provides the specific instances of the conduct of a witness for the purpose of attacking his credibility may, in the discretion of the court, be inquired into, if probative of his truthfulness.

The rule does not depend on whether the witness is a party.

In order to conscionably ask a witness questions, the cross-examiner should possess a good faith belief that there is a factual basis to ask the questions in the first place. See Rule 3.4(e) of the Rules of Professional Conduct.

Whether Sergeant Lacey knowingly conspired with Renato Garcia to launder money related to drug dealings is a question, but he, at the very least, appears to have participated in a scheme with Renato Garcia to underreport the cost of the purchase of a vehicle in order to mitigate the effect of Rhode Island's Sales Tax by participating in the falsification of documents in association with that purchase.

It is axiomatic that parties may obtain discovery of any matter that is relevant to the claim or defense of a party, including the existence of documents and identity and location of persons having knowledge of any discoverable matter. Fed. Rule Civ. P. 26(b)(1).

Moreover, relevant information need not itself be admissible at the trial to be discoverable if the information appears reasonably calculated to lead to the discovery of admissible evidence.

The questioning of Sergeant Lacey sought to discover very important and relevant information concerning Lacey's honesty and truthfulness.

Neither Lacey, nor anyone on his behalf, filed a Motion to Quash the subpoena or to even request that the deposition not be conducted until Lacey's objections could be resolved. In fact, the undersigned had a telephone call with Attorney Colucci on June 6, 2005 in which Attorney Colucci refused to adopt a position on whether Lacey would comply with the subpoena or answer questions posed to him in the deposition concerning the purchase of the Porsche. Attorney Colucci's refusal to adopt a position with respect to Lacey's compliance precipitated a letter from the undersigned to Attorney Colucci dated June 6, 2005, which is appended and marked as Exhibit "E".

By instructing Lacey not to answer the questions, Attorney Colucci assumed the role of judge, professing that the information could not be elicited because it would be later ruled inadmissible.

In summary, Sergeant Lacey's credibility is very much at play in this case. In conformance with his report, he will testify that the plaintiff, William Maynes, admitted that he

gave permission for two of the searches that would otherwise be violative of his Fourth Amendment right to be free from unreasonable searches and seizures. Sergeant Lacey may or may not have engaged in specific instances of conduct that would be probative of his truthfulness or untruthfulness but the plaintiff certainly is entitled to inquire and was certainly entitled to compliance with the subpoena and answers to questions.

For the foregoing reasons, the plaintiff respectfully requests an order that Sergeant Lacey (whom Attorney Colucci has claimed to represent) be instructed to comply with the plaintiff's subpoena, answer the questions posed when his deposition reconvenes, and that appropriate sanctions be levied in an amount calculated to compensate the plaintiff for the time expended on the issue and to adequately discourage any further discovery abuse.

THE PLAINTIFF
WILLIAM MAYNES

BY HIS ATTORNEY

Charles Michael Bradley
39 Grove Ave.
Westerly, RI 02891
(401) 596-0808
Fed. Bar No.: 3551

**CERTIFICATION**

I hereby certify that a copy of the foregoing *Memorandum of Law in Support of Motion to Compel and Motion for Contempt Pursuant to Rules 37 and 45 of the Federal Rules of Civil Procedure with appended Motion* was mailed this 30 day of June, 2005 to the following counsel of record:

Attorney Michael J. Colucci
Olenn & Penza, LLP
530 Greenwich Ave.
Warwick, RI 02886

Charles Michael Bradley
Fed Bar No. 3551

Ref: 04-17-IA

Sgt. Shawn M Lacey

Re: 03-4382-OF

Date: 05/05/2004

Time: 12:00pm

On 01-28-2004 Chief Baker advised me to contact William Maynes regarding the above listed OF which was the result of a motor vehicle stop and a Civilian Complaint from the operator of the vehicle involved. Cpl. Williams who was the supervisor at the time of the incident gave me an overview of the incident and I advised Chief Baker I would speak with Maynes regarding the incident. I spoke with Mayes on the phone on 01-28-04 and discussed the incident with him. At that time we made arrangements for him to come into the station and discuss the incident with me, in an attempt of trying to satisfy his concerns.

On 02-18-2004 at 3:15pm Maynes came into the station and we went into interview room #1. The meeting lasted over 2 hours and concluded at 5:30pm. Maynes started out giving me his version of what took place on
12-27-2003 @ 2:50pm. Maynes stated that he stopped on Langworthy Road on this date and asked two officers who were parked, for directions to a particular street. He said that he then continued to the street just off Rt #1 and the person he was looking for was not home. He then proceeded to go back toward Rt. #1. When pulling up to the stop sign at the intersection of Rt. #1 and the Sand Dollar Motel a cruiser drove passed him. He made a right hand turn back onto Rt. #1 to go back to his house and the next thing he saw, was a cruiser coming up behind him with its lights on. He said that he turned right onto Langworthy Road and pulled into the Dunn's Corners Fire Department parking lot and stopped. He said that the officer got out of his cruiser and approached the driver's side of his vehicle. The officer asked for his license, registration and insurance information. He then said that he asked the officer what he was stopping him for. He indicated the he was very nervous and was shaking trying to retrieve his license, registration and insurance. He said that the officer asked him why he was so nervous and asked if he had anything in his vehicle. Maynes told the officer he did not, and the officer asked him to step out of the vehicle. He said that the officer told him he was not under arrest at this time. At this point a second cruiser pulled in and another officer got out of his cruiser and approached him standing at the side of the first police cruiser on scene. He said that the second officer, who he described as short blond hair, big build, and very intimidating, started to yell at him telling him that he "got him last time but he will not get him again". Maynes said that he was nervous and did not say anything. He was then placed in handcuffs and placed in the back of the cruiser he was

standing at, again being told he was not under arrest. He said that both officers started going through his vehicle. He said that after checking the vehicle he was taken out of the cruiser and the handcuffs were taken off, and it was explained the he was stopped for speeding 50mph in a 40mph zone. He was informed he was not going to be issued a summons and would be given a break on the speeding charge. He was released and was told he was free to leave.

I then advised him I spoke with both officers involved and I advised him of both their names. He indicated that he had spoken to Ptlm. Burton on the phone where Burton was trying to explain the situation surrounding the incident. Maynes said that he became upset over the conversation and decided he did not want to speak Ptlm. Burton any longer. He said that he felt he was treated disrespectfully and rude. He said that his actions were not disrespectful and he was so nervous he defecated in pants while the officers were talking with him.

I explained to Maynes that the officers recounting of the incident is very similar to his. I then apologized to Mayne on behalf of the police department if this incident upset him, or if he felt he was treated wrongly by this department. I advised him I was going to try and explain the officers' actions on the day of the incident. I told him that according to the officers, the stop Maynes made in order to ask for directions had nothing to do with the motor vehicle stop some twenty minutes later. Maynes said that he felt the officers went looking for him, and I advised him that the officers indicated that this was not the case, nor did I feel this was the case. I explained that once the car stop was made, Ptlm. Burton notified dispatch and Ptlm. Campbell was sent as backup, which would explain why he arrived some five minutes after the car stop. I explained that Ptlm. Burton indicated that Maynes appeared to be very nervous as he was moving and reaching around inside of his vehicle. Ptlm. Burton then indicated that he went back up to Maynes' vehicle and asked him why he was reaching into his back pocket, and Maynes indicated that he did not know. At this point Ptlm. Burton had Maynes step out of his vehicle and conducted a pat down on him for the officer's safety. I explained to Maynes this is not an uncommon practice. If an officer feels as though the actions of an individual jeopardized the safety of an officer, they will conduct a pat down for their protection as well as the individuals involved. I explained that Burton indicated that when he (Maynes) placed his hand on the cruiser for the officer to pat him down, that he continued to take his hands off the cruiser and continued to move around. Maynes indicated that this was probably true and he may have been doing this because he was nervous. I explained that Ptlm. Burton placed handcuffs on him at this point because he was not listening to his instructions and would not stay still as Ptlm. Burton was trying to pat him down. Maynes said that he understood and indicated that he was not listening to the officer. Ptlm. Burton indicated that he asked Maynes if he could check his wallet and that he (Maynes) indicated that he did not care. Maynes said that he might have said that because he had nothing to hide. Inside of the wallet a Viargra pill was found and a large sum of money. Ptlm. Burton asked Maynes if he had a prescription for the pill, and Maynes indicated

that he did. Maynes agreed that the conversation regarding the pill did take place, and also agreed with the account of the officers' version as well.

At this point the second officer arrived on the scene, Ptlm. Campbell. The handcuffs were taken off of Maynes at this point and he was placed into the rear of the cruiser, and was advised he was not under arrest. I explained that Ptlm. Burton indicated that he asked if he could search Maynes' vehicle and Maynes indicated the Officer could go ahead with the search. Maynes said that he does not remember that, however indicated that he may have. After checking the vehicle both officers indicated Maynes was released from the vehicle and explained why he was stopped and that he was going to receive a verbal warning for speeding. He was then released to go back to his vehicle.

Maynes indicated the he did not disagree that the officer report indicates what took place, however he said that he did not appreciate being spoken to the way the officers did, especially Ptlm. Campbell. He said that he made him so nervous that he defecated in his pants. He said that he also disagreed with Ptlm. Burton's claim that he stopped him for speeding when he was not even on Rt. #1 when Burton passed him. He said that he still felt they were coming after him because Ptlm. Campbell had arrested him in the past for DWI.

I explained that Ptlm. Campbell indicated that he did not realize who Mayne was until he pulled up to back up Ptlm. Burton on the car stop. I also explained that Ptlm. Burton said that he passed Maynes vehicle on Rt. #1 and picked him up on radar traveling 50mph in a posted 40mph zone. Ptlm. Burton indicated he did not realize Maynes was the same person who stopped for directions until he pulled up behind his vehicle on the car stop.

I then asked Maynes if he wanted to speak with the officers and he indicated that he would, in an attempt to resolve the issue. Both Ptlm. Burton and Ptlm. Campbell came into the side room separately with myself present and attempted to explain their actions to satisfy Maynes. Both apologized that the incident upset him, however both explained they felt their actions were justified. Maynes also explained the he felt the police department is going to be looking for him all the time. I again assured him that was not going to happen and if in fact he had any problems he could contact me.

At the conclusion of the meeting Maynes indicated that he was satisfied with our meeting and indicated that he felt more comfortable with the incident. I advised him to let me know if he was satisfied with the outcome and I would forward a report to the Chief indicating same. He said that he would let me know within a few days, but indicated he was pretty sure he was satisfied and was not looking to go any further with his complaint. He also indicated he was satisfied with my efforts to resolve the situation and appreciated being treated with respect by myself and

Case 1:04-cv-00276-T Document 40-2 Filed 07/05/2005 Page 4 of 4



the two officers involved. The meeting concluded at 5:30pm and I had no further contact with Maynes.

As a result of my involvement it is my belief that this incident had been resolved. On 05-04-2004 Chief Baker advised me that a complaint had been received by the Town Hall. He advised me to type a memo regarding my involvement in the incident and any meetings I had with Mr. Maynes.

AO 88 (Rev. 1/94) Subpoena in a Civil Case

# Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF
RHODE ISLAND

William Maynes
V.
Arthur Burton, et al.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER:[1] C.A. No. 04-276T

FILED
WASHINGTON COUNTY
SHERIFF'S OFFICE
DATE: 5-16-05
NUMBER: 2783

TO:
Shawn Lacey

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
All notes made in conjunction with interviewing anyone referable to the incident involving William Maynes, Arthur Burton and James Campbell on 12/27/03;

Copies of all records in your possession referable to the purchase of the 1998 Porsche (see attachment)

| PLACE | DATE AND TIME |
|---|---|
| Law Offices of Hinchey & Cummings, 120 Broadway, Norwich, CT | 6/8/05 @ 10 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| [signature] plaintiff | May 9, 2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Charles Michael Bradley, 39 Grove Ave., Westerly, RI 02891 (401) 596-0808

***Attachment to Shawn Lacey Subpoena***

(continued) Carrera, model 942, V.I.N. WTOCA2998W8340842, including but not limited to, copies of any purchase and sales agreements, or other indicia of payment for same, including copies of cancelled checks (both sides of checks);

Any paperwork referencing the value of the 1998 Porsche Carrera, model 942, V.I.N. WTOCA2998W8340842, generated either in conjunction with the purchase or in conjunction with any insurance claim made referable to the vehicle; copies of any paperwork associated with the registration of the vehicle with the Rhode Island Department of Motor Vehicles.

**MICHAEL BRADLEY** • *ATTORNEY AT LAW*
39 GROVE AVENUE • WESTERLY, RHODE ISLAND 02891 • (401) 596-0808 • JURIS NO. 305353 • R.I. CODE 3551

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| William Maynes | : | |
| Plaintiff | : | C.A. NO.: 04-276T |
| v. | : | |
| Arthur Burton, et al | : | |
| Defendants | : | May 6, 2005 |

## NOTICE OF DEPOSITION

Please take notice that on Wednesday, June 8, 2005 at 10:00 a.m. the attorney for the plaintiff will take the deposition of Shawn Lacey, for purposes of discovery or for use as evidence, or both, before the court reporters of Shea and Driscoll, or other competent authority, at the Law Offices of Hinchey & Cummings, 120 Broadway, Norwich, Connecticut. The deponent is ordered to bring with him to the deposition the following documents:

All notes made in conjunction with interviewing anyone referable to the incident involving William Maynes, Burton and Campbell on 12/27/03;

Copies of all records in his possession referable to the purchase of the 1998 Porsche Carrera, model 942, V.I.N. WTOCA2998W8340842, including but not limited to, copies of any purchase and sales agreements, or other indicia of payment for same, including copies of cancelled checks (both sides of checks);

Any paperwork referencing the value of the 1998 Porsche Carrera, model 942, V.I.N. WTOCA2998W8340842, generated either in conjunction with the purchase or in

conjunction with any insurance claim made referable to the vehicle; copies of any paperwork associated with the registration of the vehicle with the Rhode Island Department of Motor Vehicles.

THE PLAINTIFF,

Charles Michael Bradley, Esq.
39 Grove Avenue
Westerly, RI 02891
(401)596-0808
Federal Bar No.: 3551

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed via certified mail, return receipt requested, on this 7 day of May, 2005 to:

Attorney Michael J. Colucci
OLENN & PENZA, LLP
530 Greenwich Ave.
Warwick, RI 02886

Attorney Richard B. Woolley
Special Ass't. Atty. Gen.
155 South Main St.
Providence, RI 02903

Charles Michael Bradley, Esq.

A. Yes, I did.
Q. And when you realized that you were being deposed in this case at any time from the time you knew you were going to get deposed until today, did you examine any documents?
A. Yes, I did.
Q. And what documents did you examine?
A. Just the report that I completed regarding the incident.
Q. And that's the only material you brought with you to the deposition today?
A. No. I brought other material.
Q. Okay. What else did you bring with you today?
A. My notice of the deposition.
Q. Okay.
A. That's it.
Q. Okay. You understand that -- or do you understand that some of the things that you wrote in your report conflict with things that Mr. Maynes had said happened on December 27, 2003?
A. I -- yes, I do.
Q. Okay. And how did it come to pass that you understood that there were conflicts between what you wrote in your report and what Maynes has said?
A. From Attorney Colucci.

Q. And have you gone through the various points of conflict in your report with Attorney Colucci?

A. No.

Q. Okay. But Attorney Colucci has explained to you that there are conflicts between what you have said in your report and what Maynes maintains?

ATTY. COLUCCI: Careful. What I explained. Claim privilege on that.

ATTY. BRADLEY: Are you claiming that you're representing --

ATTY. COLUCCI: Yes, yes.

ATTY. BRADLEY: Let me finish before you answer. Are you claiming that you represent Shawn Lacey here today?

ATTY. COLUCCI: Yes, that's correct.

ATTY. BRADLEY: Okay. And you're claiming attorney client privilege between you and Sergeant Lacey?

ATTY. COLUCCI: If you go into areas that are covered by the privilege, yes, such as the last question.

ATTY. BRADLEY: So conversation --

ATTY. COLUCCI: It's rather innocuous, but I don't want to go too far down the road and have a problem.

ATTY. BRADLEY: You're representing Sergeant Lacey?

ATTY. COLUCCI: In connection with this case, yes, and certainly today I'm representing him.

ATTY. BRADLEY: Are you maintaining that Sergeant Lacey is a party to this case?

ATTY. COLUCCI: Not yet.

ATTY. BRADLEY: Okay.

ATTY. COLUCCI: I'm concerned about allegations you've made in the past about department-wide conspiracy. I do have that concern.

ATTY. BRADLEY: So you are representing Sergeant Lacey here today as his attorney?

ATTY. COLUCCI: Yes, that's true.

Q. (By Atty. Bradley) Okay. Sergeant, the reason that you're being deposed is because of those conflicts. You understand that?

A. No. I understand that's what you're telling me, yes.

Q. You are. You're being deposed because of conflicts between your report and things that Maynes had said?

A. Okay.

Q. Without those conflicts, there is really no need to make any inquiries of you at all. Do you understand that?

A. Yes, I do.

Q. So that if, in fact, things that were written in your report that's dated May 5, 2004 were not insisted upon by you as being accurate, then there wouldn't really be any need for you to be here. Do you understand that?

A. Yes, I do.

ATTY. BRADLEY: Okay. Can I have this marked please.

(Plaintiff's Exhibit 1, police report, was marked for identification.)

Q. (By Atty. Bradley) Sergeant Lacey, I've marked a document as Plaintiff's No. 1 for identification. Can you tell me what that is?

A. Yes, I can. This is a report that I prepared regarding Internal Affairs 04-17.

Q. Okay. And does this report relate to your questioning of Williams Maynes, and Campbell, and Burton with respect to the events of December 27, 2003?

A. Yes, it does.

Q. And the date of the report is May 5, 2004. Right?

A. That's correct, yes.

Q. And the report is the product of interviews that you conducted with Maynes, Burton, and Campbell on February 18, 2004. Right?

A. Yes, it is.

Q. Okay. Did you ever talk with either Maynes, Campbell, or Burton about the events of December 27, 2003 at any time after February 18, 2004 and before you wrote this report on May 5, 2004?

A. Clarification. You're asking if I talked to these

guys; Maynes, Burton, Campbell?

Q. Any one of them between after the 18th of February but before you wrote this report about the events of December 27, 2003.

A. Well, I don't believe I talked to Maynes again. I'm sure I talked to Burton and Campbell at some point during that.

Q. So at least with respect to Maynes and whatever Maynes said to you, it was limited to what he said to you on February 18, 2004. Right?

A. Yeah. Also, I spoke with Maynes on the phone on 1/28/04.

Q. Okay. All right.

A. So I spoke with Maynes a couple times; but if you're asking me if I spoke with him after the 18th, no, I don't believe I did.

Q. Now, when you spoke to him either on the 28th of January, 2004 or February 18, 2004, did you make any note of the conversation with Maynes?

A. The 28th -- well, the 28th I set up the meeting for the 18th; so, yes, I did. I must -- I wrote a note on paper indicating he was coming in on the 18th. The 18th I did make notes, yes.

Q. And where are they?

A. I don't have them any longer.

Q. Okay. And when you were doing this investigation, can you tell me what you understood to be your task? What was your purpose in asking the questions of these three people? Was it to conduct an internal investigation?

A. Yes. I'm -- yes, it was. It was -- well, it was a first step. Basically, there was a complaint allegation received. I in turn was instructed to contact Maynes to find out, in fact, what it is and if it can be resolved.

Q. Well, I want to be careful with the terminology. Did you consider yourself to be starting an internal investigation when you talked to Maynes on February 18, 2004?

A. No. I wouldn't say I did.

Q. Okay. It was more of an attempt to resolve a problem -- perceived problem between Maynes and two officers of the Westerly Police Department. Right?

A. That's correct, yes.

Q. Okay. And as of February 18, 2004, you felt that the problem had been resolved, didn't you?

A. At the end of the interview with Maynes February 18th --

Q. Yes.

A. -- 2004? Well, I didn't feel at that point it was resolved. Maynes if it was not resolved and -- and he wasn't satisfied, he was, in fact, to let me know. I didn't

hear from him after that point, so I had assumed, yes, it was resolved.

Q. Well, let me just take a moment here and look. You wrote in what has been marked as No. 1 on Page 3 last paragraph, "At the conclusion of the meeting, Maynes indicated that he was satisfied with our meeting and indicated that he felt more comfortable with the incident." You wrote that. Right?

A. That's correct. Yes, I did.

Q. Okay. And because Maynes indicated that to you, you felt on February 18th that the problem was probably resolved between Maynes and Burton and Campbell. Right?

A. No. I -- no. I wouldn't say I felt it was resolved. If you read the next sentence, it goes on. I told him to let me know if, in fact, he was not satisfied with the outcome. And I didn't hear from him, so, I mean, I wouldn't say I was completely satisfied this thing was resolved. No, I did not.

Q. Okay. So when did you make any notes of the conversation with Maynes? Did you do it on February 18th?

A. February 18th I did the meeting.

Q. And when did you discard the notes that you had kept?

A. After I did this report.

Q. So you actually had notes available to you when you

made this report?

A. Yes, I did.

Q. Okay. You knew when you made this report that Maynes had instituted a lawsuit. Right?

A. I don't know if it was a lawsuit or he filed a civilian complaint. I'm not quite sure. I'd have to look at the report to see. I don't know if I knew there was a lawsuit. It would indicate in the report if, in fact --

Q. You knew?

A. Yeah. Basically, on 5/4 I was advised that a complaint had been received by town hall. I didn't know anything of a lawsuit at that point.

Q. Okay. You didn't know what kind of complaint had been received?

A. Well, yeah, a civilian complaint form. A formal complaint form must have been received by the town hall, I assume; but I didn't know if that's your question. No.

Q. And not withstanding you knew that a formal complaint had been filed, you discarded the notes that you kept of the conversation between you and Maynes on February 18, 2004?

ATTY. COLUCCI: Objection to the form of the question. You can answer.

Q. (By Atty. Bradley) Okay. You can answer?

A. Repeat the question. You're asking if I discarded

them before this 5/4 date?

Q. You just testified earlier that you discarded those notes after you wrote that report?

A. That's correct, yes.

Q. Okay. Why did you do that?

A. Because I -- well, it was a legal pad. I made some notes at the interview. I did the report, threw the notes away.

Q. So do you recall what was on the notes?

A. No, I do not. I mean, exact, no, I don't.

Q. Okay. How many pages of notes were there?

A. One. It was a legal pad. It wasn't even a full page..

Q. Did you write any quotes from Maynes on the legal pad?

A. Yes, I did.

Q. Do you remember what those quotes were?

A. They would be in this report. I don't know off the top of my head now.

Q. Okay. Well, let's take a look at Exhibit No. 1. As you sit here today, June, 2005 --

A. Uh-huh.

Q. -- are you able to remember anything that Maynes said to you in February of 2004 without reference to this report?

A. No. Well, I can -- no. I'm not going to try to come up with things he said to me. I'd like to reference a report.

Q. So you couldn't out of your own memory testify with any accuracy as to what Maynes said to you on February 18, 2004. Is that true?

A. After referring to the report, I could.

Q. Okay. So your recollection would be refreshed by referencing the report?

A. That's correct.

Q. And as you sit here today, you're going to insist on the accuracy of everything that you wrote in this report?

A. That's correct.

Q. Okay. You were asked to bring with you today certain materials having to do with the transaction where you bought a Porsche. Right? Weren't you?

A. That's correct. Yes.

Q. Okay. And were you instructed not to obey that subpoena?

ATTY. COLUCCI: Objection. Let me make a statement now and get this out of the way.

ATTY. BRADLEY: Mark that while he's making it. Well, I guess you have to type his statement.

ATTY. COLUCCI: This portion of the subpoena as well as any questions that you may or may not ask about it

we object to, and I will instruct him not to answer or provide those documents if they exist to you.

However, based on some discussions you and I had previously, Mike, I guess you still intend to inquire somewhat into this area. I just want to make a few comments about it now because I think we'll cover the issue.

Obviously, transaction about some automobile purchase is not a part of Mr. Maynes' complaint. It is at best a collateral or peripheral issue that you are inquiring about or may inquire about today. Therefore, I don't think it's proper, nor do I think you have the authority to subpoena or otherwise to inquire at this deposition about it.

Having said that, however, I would concede that it may be something you could inquire into under Rule 608 with specific incidents of conduct that may go to truthfulness as you have framed the rumors you've heard or the allegations to me. However, that rule is pretty solid and pretty clear that while you may ask about the issue itself, whatever it is you want to ask what he did, whatever the specific instance of conduct it is that you believe you have knowledge of, I guess you are entitled to ask him that; and you are entitled an answer to that question.

However, the rule is just as clear as well as the First Circuit that extrinsic matters may not be inquired

into, extrinsic evidence. In essence, you can ask him if he committed whatever act it is you believe he committed, but extrinsic evidence of that is not permitted; and because it is a completely peripheral issue even though this is a deposition, there is no legitimate argument that you can make in my opinion -- and I know we'll disagree on this -- that somehow inquiry into those areas might lead to admissible evidence because Rule 608 is quite clear; so on that basis I don't even believe you have a right to ask it at a deposition. It's no different from sitting a witness down and asking him, for example, have you ever cheated on your wife, have you ever not reported all your income on tax returns. You just can't go into those areas. A license to take a deposition does not -- especially being in federal court -- does not give you unfettered access to every part of a person's personal life; and so I'm not going to permit any questions beyond your asking him whether he committed whatever specific act you believe he committed. He'll answer that question, but anything else about that that may be extrinsic to that, the records, anything that may be extrinsic, I'm going to instruct him not to answer; and if we need to battle it out at some point in the future, so be it. But I think we're pretty solid on that, and that's what -- how it's going to be from our end. If you prove me wrong, you prove me wrong; but I think we're pretty solid on

that.

That's my position. That's not going to change today, and I know you may disagree. Maybe I have convinced you otherwise. I don't know so --

ATTY. BRADLEY: Are you done?

ATTY. COLUCCI: Yup.

ATTY. BRADLEY: Okay. Let's mark this.

(Plaintiff's Exhibit 2, subpoena, was marked for identification.)

ATTY. BRADLEY: For the record, Plaintiff's Exhibit No. 2 is a subpoena directed to Shawn Lacey. Looks like it was served on Sergeant Lacey on May 16, 2005. Page 1 is the subpoena. The second page is a continuation page representing the things that Sergeant Lacey was directed to bring to his deposition today. Page 3 is the notice of deposition dated May 6, 2005. Page 4 is the second page of the notice of deposition.

Q. (By Atty. Bradley) Now, Sergeant Lacey, did you bring with you here today any -- all notes made in conjunction with interviewing anyone referable to the incident involving William Maynes, Arthur Burton, and James Campbell on December 27, 2003?

A. I brought my report.

Q. Okay. Is that all you brought?

A. That's right. Correct, yes.

Q. Did you bring with you copies of all records in your possession referable to the purchase of a 1998 Porsche Carrera, model 942, V.I.N. WTOCA2998W8340842 including but not limited to copies of any purchase and sales agreements or other indicia of payment for same including copies of cancelled checks both sides?

A. No, I did not.

Q. Why not?

ATTY. COLUCCI: Objection. Don't answer that based on my prior statement.

Q. (By Atty. Bradley) Did you bring with you any paperwork referencing the value of the 1998 Porsche Carrera, model 942, V.I.N. WTOCA2998W8340842 generated either in conjunction with the purchase or in conjunction with any insurance claim made referable to the vehicle?

A. No, I did not.

Q. Did you bring any copies of any paperwork associated with the registration of the vehicle with the Rhode Island Department of Motor Vehicles?

A. No, I did not.

Q. Okay. And why not?

ATTY. COLUCCI: Same instruction. Also add attorney client to that particular objection.

Q. (By Atty. Bradley) Now, did you, in fact, buy a Porsche Carrera, model 942, from Remskip Auto?

ATTY. COLUCCI: Objection. Same instruction. That's extrinsic. Don't answer the question.

Q. (By Atty. Bradley) Did you make an insurance claim with respect to the burning up of a Porsche that was under your ownership?

ATTY. COLUCCI: Objection.

ATTY. BRADLEY: Do you have a reason on this one?

ATTY. COLUCCI: Did he make an insurance claim?

ATTY. BRADLEY: Yes.

ATTY. COLUCCI: Same instruction.

ATTY. BRADLEY: What is that instruction for the record just so Judge Torres (phonetic) understands it.

ATTY. COLUCCI: It's an extrinsic question you're asking. Certainly making a claim is not a supposedly bad act.

ATTY. BRADLEY: Okay. Are you done?

ATTY. COLUCCI: Yes.

ATTY. BRADLEY: Thank you.

ATTY. COLUCCI: And I don't want to waive the previous objection by letting him go down the path by answering some questions that I believe are extrinsic to the ultimate question which I think, as you said, you're free to ask him that.

ATTY. BRADLEY: What am I free to ask him, by the way? I'm not sure what you are letting me ask him.

ATTY. COLUCCI: I'm basing this on prior things you told me.

ATTY. BRADLEY: Why don't you just answer the question as to what you're going to let him answer. You already put an objection on the record before I started my questions that lasted four minutes. I timed it on my cell phone so --

ATTY. COLUCCI: I'm trying to shorten the process for everyone.

ATTY. BRADLEY: Could you do that?

ATTY. COLUCCI: I didn't want to have to keep doing this.

ATTY. BRADLEY: Tell me what kind of questions you're going to allow me to ask him this morning about the purchase of the Porsche.

ATTY. COLUCCI: I'll try to explain it again.

ATTY. BRADLEY: Don't take four minutes this time, okay, because I'm paying for the deposition.

ATTY. COLUCCI: If you keep interrupting me, it may take eight minutes.

ATTY. BRADLEY: Well, if it does --

ATTY. COLUCCI: You have made references that you believe that there was some type of fraudulent --

ATTY. BRADLEY: Okay. I'm going to stop. I'm going to keep on asking questions. I'm not going to listen

to you lecture. I'm going to ask questions. You instruct him not to answer the question I ask him. I'm not going to sit here and listen to a lecture from you.

ATTY. COLUCCI: You asked me --

ATTY. BRADLEY: I'm done.

Q. (By Atty. Bradley) Sergeant Lacey, I'm going to ask you a question now. Okay? Are you ready for it?

A. Yes.

Q. Did you buy a 1998 Porsche from Remskip Auto?

ATTY. COLUCCI: Objection. Don't answer it.

Q. (By Atty. Bradley) Okay. Did you pay --

ATTY. COLUCCI: Let me just say that all my instructions are based on the previous explanation that I gave at the outset.

ATTY. BRADLEY: That's great. Thanks. We got you. Everybody understands.

ATTY. COLUCCI: You're welcome. I'm glad you do.

ATTY. BRADLEY: Good.

Q. (By Atty. Bradley) Now, did you pay -- did you misrepresent on Rhode Island Department of Motor Vehicles paperwork how much you paid for the Porsche that you bought?

ATTY. COLUCCI: That you can answer.

A. No, I did not.

Q. (By Atty. Bradley) So you did buy a Porsche?

ATTY. COLUCCI: Objection. Don't answer that one.

Same instruction.

Q. (By Atty. Bradley) How much did you pay for the Porsche that you bought?

ATTY. COLUCCI: Objection. Same instruction.

Q.. (By Atty. Bradley) Did you fill out paperwork in association with the purchase of a 1998 Porsche?

ATTY. COLUCCI: Same instruction.

ATTY. BRADLEY: Which is don't answer?

ATTY. COLUCCI: Yes.

Q.. (By Atty. Bradley) Okay. Have you been -- are you aware of any investigation being conducted about you by the Rhode Island State Police?

ATTY. COLUCCI: Same instruction.

Q. (By Atty. Bradley) Have you had any discussions with the Westerly Police Department concerning any investigation of you by the Rhode Island State Police?

ATTY. COLUCCI: Same instruction.

Q.. (By Atty. Bradley) Sergeant Lacey, have you ever been arrested?

A. No, I have not.

Q. Have you ever been investigated in conjunction with any crime?

A. No, I have not.

Q. Do you use cocaine?

ATTY. COLUCCI: Objection. I guess you can answer

that one.

A. No, I do not.

Q. Have you ever used cocaine?

A. No, I have not.

Q. Have you ever used any illegal drug?

A. Marijuana.

Q. When did you do that?

A. High school.

Q. Do you derive any income from any source other than your occupation as a Westerly police officer?

ATTY. COLUCCI: Objection.

ATTY. BRADLEY: Are you going to instruct him not to answer it?

ATTY. COLUCCI: He can answer that question, but I'll tell you what. If you go further down the road -- he's not a party yet anyway. I am going to instruct if you keep going down that road.

ATTY. BRADLEY: Why don't we wait until I get there.

ATTY. COLUCCI: Maybe you won't now.

Q. (By Atty. Bradley) Do you have any sources of income outside of your employment with Westerly Police Department?

A. Yes, I do.

Q. What do you do?

A. I have a building company.

Q. And do you have any partners in that building company?

A. Yes, I do.

Q. Who are they?

A. Stano Trombino.

Q. He's a Westerly police officer too. Correct?

A. That's correct.

Q. Who else?

A. That's all.

Q. And did Stano Trombino (phonetic) buy a Porsche, buy any cars from Remskip Auto?

ATTY. COLUCCI: Same instruction. Now we're going down that road. Let's stick to the case of William Maynes against the Town of Westerly.

ATTY. BRADLEY: How about you put on your objection on the record. Then we'll go on.

ATTY. COLUCCI: Same objection based on the prior statement I made earlier.

ATTY. BRADLEY: Let's be careful because sometimes you object and don't instruct him to answer. I'd appreciate if you're going to instruct him not to answer just to verbalize your instructing him not do. Okay? Can you do that?

ATTY. COLUCCI: I think I just did.

ATTY. BRADLEY: Have you instructed him not to answer a question about whether Stano Trombino bought a car from Remskip?

ATTY. COLUCCI: Yeah.

ATTY. BRADLEY: Okay. Good.

Q.. (By Atty. Bradley) Just so I'm clear on this, at one point in this deposition you said you were conducting an internal investigation in February of 2004 when you talked to Maynes, and then at another point you said it was more like a mediation. Which was it?

ATTY. COLUCCI: Objection to the form. You can answer.

A. No, I did not. You asked me what this report was in reference to, and I told you Internal Affairs Investigation 04-17.

Q. (By Atty. Bradley) So --

A. At the time when I conducted my investigation of Maynes, yes, it was a mediation. It was not an Internal Affairs investigation at that point.

Q. Okay. And when did it become -- did you participate in an Internal Affairs investigation of Maynes?

A. No, I did not. This is my only participation right here.

Q. Okay. When you were asked -- involved in asking questions of Burton, Campbell, and Maynes, did you ever in

TR-1
Rev. 01/02

JG 1/5/04

# STATE OF RHODE ISLAND

DEPARTMENT OF ADMINISTRATION / DIVISION OF MOTOR VEHICLES
APPLICATION FOR REGISTRATION AND TITLE CERTIFICATE

**INSTRUCTIONS - PLEASE PRINT**

YOU SHOULD READ IMPORTANT INFORMATION ON REVERSE SIDE
CHECK ONE (✓) — COMPLETE SECTIONS INDICATED

1 ☐ NEW REGISTRATION — B C D E F G H
2 ☒ TRANSFER REGISTRATION — A B C D E F G H
3 ☐ CANCEL REGISTRATION (JUNKED, STOLEN, DESTROYED, SOLD) — A B F H
4 ☐ DUPLICATE REGISTRATION — A B F G H
5 ☐ PLATE CHANGE ☐ STOLEN PLATE CHANGE — A B F G H
6 ☐ UPDATE CURRENT INFO — A B C F G H
7 ☐ SURVIVING SPOUSE — A B D E F G H
8 ☐ VANITY PLATE ORDER — A B H

**(FOR OFFICIAL USE ONLY)**

NEW REGISTRATION NO | TYPE | TAX PAID
OTHER
TIN 065-502-2010 | TOTAL $ 530

**A. REGISTRATION NUMBER**

CURRENT REGISTRATION NO. 12566 | TYPE PASS

**B. OWNER'S INFORMATION**

LAST NAME: LACEY
FIRST NAME: SHAWN | MIDDLE INITIAL: M | JR III ETC
RESIDENCE NO. & ST ADDRESS (WHERE VEHICLE IS KEPT OR GARAGED): 12 Frontage Road
CITY / TOWN STATE & ZIP: WESTERLY RI 02891
MAILING ADDRESS (if different from residence): Same
CITY / TOWN STATE & ZIP:
DRIVER LIC NO: 835010 | DATE OF BIRTH: MONTH 12 DAY 06 YEAR 66
DEALER OR FLEET NO.

**C. LESSEE'S INFORMATION (Leased Vehicles)**

LAST NAME
FIRST NAME | MIDDLE INITIAL | JR III ETC
RESIDENCE NO. & ST ADDRESS (WHERE VEHICLE IS KEPT OR GARAGED)
CITY / TOWN STATE & ZIP
LESSEE'S DRIVER LIC. NO. | DATE OF BIRTH MONTH DAY YEAR

**D. SELLER'S INFORMATION**

DATE OF SALE: MONTH 12 DAY 23 YEAR 03 | RI DEALER'S LIC 233
SELLER'S NAME: Renship Motor Sales
NO. & ST ADDRESS: 85 Main ST
CITY / TOWN STATE & ZIP: Westerly RI 02891

**E. TITLE INFORMATION**

LIEN HOLDERS (NAME OF BANK OR CREDIT UNION WHERE YOU ARE FINANCING YOUR VEHICLE)

1 NAME — CERTIFIED
ADDRESS — R.I. REGISTRY OF MOTOR VEHICLES
CITY — OFFICIAL STAMP — STATE — ZIP
DATE OF LIEN MONTH DAY YEAR

2 NAME — MAY 27 2005
ADDRESS
CITY — STATE — ZIP
DATE OF LIEN MONTH DAY YEAR

TITLE TYPE 31 ☐ SALVAGE ☐ OUT OF STATE ☐ R.I. [signature: Charles ... Rolan]

**LATE RENEWAL - PLATE OR TITLE NUMBER**

**F. VEHICLE INFORMATION**

YEAR 98 | VIN (VEHICLE IDENT.) WP0CA2998WS340842
MAKE Porsche | MODEL 911 | BODY TYPE 2 Door | GROSS WGT 2857
COLOR Silver | # CYLINDERS 6 | IF USED MILEAGE 30109
NO. PASSENGERS VEHICLE HOLDS (INCLUDING DRIVER) 4 | MOTORCYCLES ONLY ENGINE SIZE / CC
CAMPERS AND TRAILERS ONLY LENGTH | IS VEHICLE PART OF A FLEET ☐ YES ☒ NO
MOTOR POWER (IF NOT GASOLINE INDICATE) ☐ DIESEL ☐ ELECTRIC ☐ OTHER

**G. INSURANCE INFORMATION**

LIABILITY INSURANCE COMPANY ☒ YES ☐ NO | INSURANCE COMPANY NAME
POLICY NO 51 38 D 915725 | EFFECTIVE DATES FROM 12/1/03 FROM 12/1/04
IS YOUR REGISTRATION, LICENSE OR PRIVILEGE TO OPERATE A MOTOR VEHICLE SUSPENDED OR REVOKED? ☐ YES ☒ NO
FINANCIAL RESPONSIBILITY REQUIRED ☐ YES ☒ NO | COMPANY NAME

**H. SIGNATURE**

I THE UNDERSIGNED, HEREBY MAKE APPLICATION TO REGISTER THE ABOVE DESCRIBED VEHICLE AND AS PART OF MY APPLICATION DECLARE THAT I AM THE OWNER. I DECLARE UNDER PENALTY OF PERJURY THAT NO OTHER LIENS EXISTS AGAINST THE VEHICLE EXCEPT AS DESCRIBED HEREIN AND THAT ALL STATEMENTS MADE ON THIS APPLICATION ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF.
I CERTIFY UNDER PENALTY OF PERJURY THAT I HAVE READ THE STATEMENT ON THE REVERSE SIDE AND WILL ABIDE BY CONDITIONS STATED THEREIN.
PERSONAL INFORMATION CONTAINED IN YOUR MOTOR VEHICLE RECORD WILL BE DISCLOSED ONLY IF THE STATE HAS OBTAINED THE EXPRESS CONSENT OF THE PERSON TO WHOM SUCH PERSONAL INFORMATION PERTAINS.
DO YOU CONSENT TO SUCH DISCLOSURE? ☐ YES ☐ NO

IF VEHICLE IS TO BE TITLED IN TWO NAMES, BOTH SIGNATURES ARE REQUIRED
OWNER'S SIGNATURE [signature]
OWNER'S SIGNATURE | MONTH DAY YEAR
(IF CORPORATION GIVE TITLE OF POSITION IN FULL)
SIGNATURE OF PARENT OR GUARDIAN IF MINOR AND RELATIONSHIP | MONTH DAY YEAR
NOTARY PUBLIC [signature: Donald A. Cowell]
(SIGNED AND SWORN TO AND BEFORE ME) | MONTH 1 DAY 5 YEAR 2004

**COMMERCIAL TRAILER, TANDEM TRAILER, TRUCK OR TANDEM TRUCK**

TRUCKS:
# OF AXLES
DISTANCE FROM FRONT TO REAR AXLES
(CENTER OF STEERING AXLE TO CENTER OF EXTREME REAR AXLE)
TRACTORS:
# OF AXLES
NOTE: WHEN TRACTOR IS COMBINED WITH TRAILER THE LEGAL GROSS WEIGHT WILL BE DETERMINED BY THE DISTANCE FROM FRONT TO REAR AXLE AND THE # OF AXLES OF THE COMBINED UNIT

NAME OF PERSON SUBMITTING TRANSACTION DOCUMENTS
RENATO GARCIA
NAME (PLEASE PRINT)
SIGNATURE [signature]
9651193 | RI
LICENSE #/PASSPORT # PHOTO ID | LICENSE STATE

013225

CERTIFICATE OF TITLE

**MICHAEL BRADLEY**

*Attorney at Law*

RHODE ISLAND OFFICE:
39 GROVE AVENUE
WESTERLY, R.I. 02891
(401) 596-0808

LICENSED TO PRACTICE
CONNECTICUT
RHODE ISLAND

June 6, 2005

***Via Facsimile (401) 737-5499***

Attorney Michael Colucci
Olenn & Penza
530 Greenwich Ave.
Warwick, RI 02886

***RE:*** ***Maynes v. Burton, et al.***

Dear Attorney Colucci:

This letter serves as a memorialization of our telephone call just concluded. You have represented that you will be representing Shawn Lacey at his deposition on Wednesday, June 8, 2005 at least in so far as his role with the Westerly Police Department is concerned. As you know, I have subpoenaed documents of Sergeant Lacey's related to his purchase of a Porsche. I have very strong reason to believe that it is the purchase of the Porsche, among other things, that has resulted in Mr. Lacey being the subject of an investigation by (according to Chief Mello) the Rhode Island State Police. As you know, the litmus test for admissibility of bad acts does not depend upon a conviction of a crime. As you also know, the questions that can be asked at a deposition do not depend upon the admissibility of the answers that might be adduced through the questions.

Having subpoenaed Lacey so far in advance of his deposition, coupled with this telephone call, I had hoped to have worked out some kind of an understanding with you prior to the deposition. Judging by our conversation, that is not going to happen. I will be seeking a court order and fees depending on what questions, if any, you instruct Lacey not to answer and will also be seeking fees if Lacey appears at his deposition without subpoenaed materials that were within his ability to produce.

Sincerely yours,

MB

Michael Bradley

MB:tls