MJC:ljc 6615/5 \pleading\66155Objection1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

WILLIAM MAYNES :
:
VS. : C.A. NO. 04-276T
:
ARTHUR BURTON, ET AL :

**DEFENDANTS' OBJECTION TO PLAINTIFF'S MOTION TO COMPEL AND FOR CONTEMPT**

Now come the defendants[1] and object to that motion filed by the plaintiff which seeks to compel certain deposition testimony from Sergeant Shawn Lacey and which also seeks contempt sanctions. In support hereof, a memorandum of law is attached.

DEFENDANTS,
By their Attorney,

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 7. 8. 05 to:

Charles Michael Bradley, Esq.
39 Grove Avenue
Westerly, RI 02891

[1] Although not a party, to the extent that the plaintiff's motion is directed toward Westerly Police Officer Shawn Lacey, this objection is also filed on his behalf.

MJC:ljc 6615/5 \pleading\66155Memorandum1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM MAYNES | : | |
| | : | |
| VS. | : | C.A. NO. 04-276T |
| | : | |
| ARTHUR BURTON, ET AL | : | |

**MEMORANDUM OF LAW IN SUPPORT OF OBJECTION RE: MOTION TO COMPEL/MOTION FOR CONTEMPT**

In his motion, the plaintiff requests that sanctions be levied to, among other things, "discourage any further discovery abuse." The plaintiff does not need sanctions to stop discovery abuse. He needs a mirror. For example, the plaintiff has filed numerous requests for documents from the defendants, many of which sought documents protected from discovery under various state statutes. He has deposed the chief of the Westerly Police Department, at which time requiring the chief to compile voluminous documents, several inches thick, relating to various policies and procedures, most of which have no bearing on the ultimate issues in the case. Despite a request not to, the plaintiff noticed depositions during a known period of court excusal of defense counsel. Most recently, he deposed a former dispatcher for the Westerly Police Department, who was known not to have been on duty at the time of the incident (and thus, without any personal knowledge of the particulars thereof), all for the purported purpose that the plaintiff had a lack of confidence that the dispatcher on duty (who was also deposed) would not likely tell the truth because he was still an employee. With regard to the instant motion regarding Shawn Lacey, the dispute arises not out of

matters related to the case at bar (for which Lacey provided nearly fifty pages of deposition testimony) but rather, with respect to a particular matter which is totally collateral with the potential for undue harassment and embarrassment.

The plaintiff's complaint alleges an unlawful traffic stop by defendant police officers Arthur Burton and James Campbell in December, 2003. As part of the processing of a citizen's complaint made by the plaintiff, Lacey engaged in a mediation-like role by bringing the parties together in an attempt to resolve the complaint to everyone's satisfaction. It appeared that he had been successful in doing that. However, that all changed when the plaintiff filed the within lawsuit.

Although Lacey possesses no personal knowledge of the factual circumstances occurring at a traffic stop, the defense does concede that Lacey is certainly a witness as to admissions made to him by the plaintiff during their meeting. As a witness, the defense also concedes that he is subject to the rules regarding impeachment - just as any other witnesses. However, that is the point. Despite the fact that this is a discovery dispute, the rules of evidence cannot be ignored because they are necessarily tied into the scope of permitted discovery.

Rule of Procedure 26(b) requires discovery requests to be relevant to the subject matter involved in the pending action. It is also well settled that the information that is sought does not, itself, have to be admissible but it must, at the very least, appear to be reasonably calculated to lead to the discovery of admissible evidence, *Id*. It goes without saying, then, that if the information is not reasonably calculated to lead to the discovery of admissible evidence, it is not a proper subject for discovery.

According to the plaintiff, he has some information that may suggest a fraudulent registration of an automobile purchased from an entity known as Renskip Auto Sales.

It goes without saying that the issue of Lacey's purchase and registration of the automobile is a matter which is collateral to the case at bar. A matter is considered collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." *U.S. v. Marino,* 277 Fed.3d 11, 24 (1st Cir. 2002), citing *U.S. v. Beauchamp*, 96 Fed.2d 1, 3 (1st Cir. 1983).

The plaintiff does not suggest that Lacey has been convicted of any crime related to this automobile transaction and thus, he could not impeach Lacey via Rule of Evidence 609. Moreover, because the alleged automobile transaction is not even remotely related to the plaintiff's allegations against the defendants, it could never qualify as a prior bad act which might be admissible through one of the exceptions to Rule of Evidence 404. The only possible way that the plaintiff might be able to admit evidence of the purported fraudulent transaction would be through Rule of Evidence 608(b), and that would be at the discretion of the trial judge. However, that same rule, on its face, specifically provides that "specific instances of the conduct of a witness, for the purpose of attacking or supporting a witness' character for truthfulness, other than conviction of crime as provided in Rule 609, ***may not be proved by extrinsic evidence*** . . ."

This rule is right in line with the "well established" principle that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter. *Beauchamp*, 986 Fed.2d at 3. Thus, it is often stated that when a witness testifies to a collateral matter, the examining party "must take the answer," i.e. the examiner may not disprove it by extrinsic evidence. *Id.*

In his memorandum, the plaintiff misstates that Lacey was "instructed by Attorney Colucci to refuse to answer any questions about this investigation or his dealings with Renskip/Garcia." Lacey

was permitted to answer the specific instance of alleged wrongful conduct that the plaintiff was interested in:

Q. (By Atty. Bradley) Now, did you pay - - did you misrepresent on Rhode Island Department of Motor Vehicles paperwork how much you paid for the Porsche that you bought?

ATTY. COLUCCI: That you can answer.

A. No, I did not.

See deposition of Shawn Lacey at p.23, lines 19-23 (deposition attached as Exhibit A).

Likewise, the plaintiff incorrectly states that "Attorney Colucci assumed the role of judge." The trial court will have the discretion whether or not to permit any inquiry, even as permitted by Rule 608(b). By allowing Lacey's answer pursuant to Rule 608(b), defense counsel did not assume the role of judge. Rather, he assumed that the plaintiff might be permitted to so inquire and therefore, did not instruct Lacey to refrain from answering that question. Lacey was instructed not to answer questions that could have only fallen into the category of being extrinsic evidence on this automobile transaction issue. The same objection and instruction was made with reference to the documents sought in the Lacey subpoena which related to this automobile issue because, likewise, such documents could only fall into the category of extrinsic evidence of this alleged specific instance of wrongful conduct.

At best, and at a stretch, the plaintiff might be permitted to ask Lacey whether he misrepresented matters in his registration of the motor vehicle. The plaintiff asked Lacey that question and that question was answered by Lacey, albeit in the negative. As expressly provided for in Rule of Evidence 608(b), and as stated in the well settled rule spoken of in the *Beauchamp* decision, the plaintiff "must take" that answer and cannot disprove it by extrinsic evidence. The

purpose of Rule 608(b)'s prohibition of extrinsic evidence is to avoid holding mini trials on irrelevant or collateral matters. *Beauchamp* at 4, citing *U.S. v. Ciampaglia*, 628 Fed.2d 632, 641-42 (1st Cir., *cert. denied*, 449 U.S. 956) (1980).

The fact that the plaintiff sought to inquire as to these extrinsic matters in a deposition is of no moment. To be permitted, the discovery sought must appear to be reasonably calculated to lead to the discovery of admissible evidence. This Circuit follows Rule 608(b)'s prohibition of such extrinsic evidence (i.e. see *Marino*) and also follows the general principle prohibiting extrinsic evidence to impeach witnesses by contradiction on collateral matters (i.e. see *Beauchamp*).

Defense counsel went through great lengths, at the Lacey deposition, to outline this reasoning in the hope that it would resolve the issue and avoid the very motion presently before the Court. See Lacey deposition at p.16-19. Obviously, it did not.

WHEREFORE, your defendants respectfully request that the plaintiff's motion to compel be denied and that the plaintiff's motion for sanctions be denied and, if so inclined, that the Court issue sanctions against the plaintiff for the prosecution of this motion.

DEFENDANTS,
By their Attorney,

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

## CERTIFICATION

I certify that I sent a true copy of the within on 7.8.05 to:

Charles Michael Bradley, Esq.
39 Grove Avenue
Westerly, RI 02891

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

WILLIAM MAYNES )
Plaintiff )
) C.A. NO.: 04-276T
vs. )
)
ARTHUR BURTON, ET AL ) JUNE 8, 2005
Defendants

---

DEPOSITION OF SHAWN LACEY

---

A P P E A R A N C E S

For the Plaintiff: Charles Michael Bradley, Esq.
39 Grove St.
Westerly, RI 02891

For the Defendants: Michael J. Colucci, Esq.
Olenn & Penza, LLP
530 Greenwich Ave.
Warwick, RI 02886

Jennifer Vernon, LSR
Shea & Driscoll, LLC
16 Seabreeze Drive
Waterford, Connecticut 06385





The deposition of SHAWN LACEY, taken at the request of the plaintiff pursuant to Section 52-148A et seq. of the Connecticut General Statutes before Jennifer Vernon, a Notary Public within and for the State of Connecticut, at the offices of Hinchey & Cummings, 120 Broadway, Connecticut, commencing at 10:01 a.m.

********************

STIPULATIONS

It was stipulated by and between counsel for the parties that the requirements of notice of the taking of the deposition have been complied; that proof of the qualifications of the Notary Public before whom the deposition is taken has been waived; that objections, except as to matters of form, be reserved to the time of trial; and that the deponent shall waive reading and signing of his deposition transcript.

********************





TABLE OF CONTENTS

EXAMINATION PAGE
By Atty. Bradley....................................4

EXHIBITS PAGE
PLAINTIFF'S
1 police report...........................10
2 subpoena................................19
3 dispatch records........................32
(Original exhibits attached to original transcript.)





Thereupon:

SHAWN LACEY

of 123 Frontage Road, Westerly, Rhode Island, being first duly sworn, as hereinafter certified, was examined and testified on his oath as follows:

EXAMINATION

10:01:01 BY ATTY. BRADLEY:
10:01:03 Q. Good morning, Sergeant Lacey.
10:01:04 A. Good morning, yup.
10:01:07 Q. Have you ever been deposed before?
10:01:08 A. Yes, I have.
10:01:09 Q. How many times?
10:01:13 A. Four or five.
10:01:14 Q. Has it always been in civil cases?
10:01:19 A. No.
10:01:20 Q. You've been deposed in a criminal case?
10:01:23 A. Yup.
10:01:24 Q. And have you ever been deposed in a civil case?
10:01:29 A. Yes.
10:01:33 Q. How many times in civil cases?
10:01:34 A. Three, four, I'm guessing.
10:01:37 Q. Have you ever been deposed in a civil case when you
10:01:39 were a party to the case?
10:01:41 A. Yes.
10:01:41 Q. And how many times for that?



EXHIBIT A

A. One time.
Q. Okay. And can you tell me what the nature of that case was about?
A. A house fire I had.
Q. Okay. And so it was in Rhode Island state court?
A. Correct, yes.
Q. How long ago was that?
A. Four or five months ago.
Q. Okay. And who noticed the deposition? I mean, who was the one that it was conducted at the request of?
A. I'm not sure if it was my attorney. I'm assuming Nationwide Insurance. It might have been my attorney, though, but it was probably Nationwide.
Q. Okay. Well, I'm going to explain a couple of things about depositions anyway.
A. Uh-huh.
Q. What I want you to do is answer audibly. Okay?
A. Uh-huh.
Q. And you have to usually do a little bit better than that.
A. Yes, yes.
Q. Try to wait until the question's over before you answer it, and I will try and wait until you've answered to start another question so we don't override each other for her sake and for our own.





A. Okay.
Q. Probably the most important this is to try to resist the temptation to give an answer to a question even if you don't really know an answer to a question. Sometimes deponents and people in court cases have a general feel that if a question is asked then that dictates that there must be some kind of answer. Sometimes there isn't.
A. Okay.
Q. Feel free to say there isn't. If I'm asking you a question that's confusing to you, feel free to say, I can't answer that question because I don't get it or whatever. Feel free to explain to me what it is about the question that's throwing you off. Okay?
A. Sounds good.
Q. If you, in fact, answer a question without indicating that you're confused about it, then I'm going to assume that you answered a question that you understood and that the answer is a legitimate answer. Okay?
A. Okay.
Q. Now, we're here on the case of Maynes vs. Burton, et al; and you have some understanding of what the case is about. Right?
A. Yes, I do.
Q. And before the deposition today, you talked with Attorney Colucci about a few things, didn't you?





A. Yes, I did.
Q. And when you realized that you were being deposed in this case at any time from the time you knew you were going to get deposed until today, did you examine any documents?
A. Yes, I did.
Q. And what documents did you examine?
A. Just the report that I completed regarding the incident.
Q. And that's the only material you brought with you to the deposition today?
A. No. I brought other material.
Q. Okay. What else did you bring with you today?
A. My notice of the deposition.
Q. Okay.
A. That's it.
Q. Okay. You understand that -- or do you understand that some of the things that you wrote in your report conflict with things that Mr. Maynes had said happened on December 27, 2003?
A. I -- yes, I do.
Q. Okay. And how did it come to pass that you understood that there were conflicts between what you wrote in your report and what Maynes has said?
A. From Attorney Colucci.





Q. And have you gone through the various points of conflict in your report with Attorney Colucci?
A. No.
Q. Okay. But Attorney Colucci has explained to you that there are conflicts between what you have said in your report and what Maynes maintains?
ATTY. COLUCCI: Careful. What I explained. Claim privilege on that.
ATTY. BRADLEY: Are you claiming that you're representing --
ATTY. COLUCCI: Yes, yes.
ATTY. BRADLEY: Let me finish before you answer. Are you claiming that you represent Shawn Lacey here today?
ATTY. COLUCCI: Yes, that's correct.
ATTY. BRADLEY: Okay. And you're claiming attorney client privilege between you and Sergeant Lacey?
ATTY. COLUCCI: If you go into areas that are covered by the privilege, yes, such as the last question.
ATTY. BRADLEY: So conversation --
ATTY. COLUCCI: It's rather innocuous, but I don't want to go too far down the road and have a problem.
ATTY. BRADLEY: You're representing Sergeant Lacey?
ATTY. COLUCCI: In connection with this case, yes, and certainly today I'm representing him.

ATTY. BRADLEY: Are you maintaining that Sergeant Lacey is a party to this case?
ATTY. COLUCCI: Not yet.
ATTY. BRADLEY: Okay.
ATTY. COLUCCI: I'm concerned about allegations you've made in the past about department-wide conspiracy. I do have that concern.
ATTY. BRADLEY: So you are representing Sergeant Lacey here today as his attorney?
ATTY. COLUCCI: Yes, that's true.
Q. (By Atty. Bradley) Okay. Sergeant, the reason that you're being deposed is because of those conflicts. You understand that?
A. No. I understand that's what you're telling me, yes.
Q. You are. You're being deposed because of conflicts between your report and things that Maynes had said?
A. Okay.
Q. Without those conflicts, there is really no need to make any inquiries of you at all. Do you understand that?
A. Yes, I do.
Q. So that if, in fact, things that were written in your report that's dated May 5, 2004 were not insisted upon by you as being accurate, then there wouldn't really be any need for you to be here. Do you understand that?





A. Yes, I do.
ATTY. BRADLEY: Okay. Can I have this marked please.
(Plaintiff's Exhibit 1, police report, was marked for identification.)
Q. (By Atty. Bradley) Sergeant Lacey, I've marked a document as Plaintiff's No. 1 for identification. Can you tell me what that is?
A. Yes, I can. This is a report that I prepared regarding Internal Affairs 04-17.
Q. Okay. And does this report relate to your questioning of Williams Maynes, and Campbell, and Burton with respect to the events of December 27, 2003?
A. Yes, it does.
Q. And the date of the report is May 5, 2004. Right?
A. That's correct, yes.
Q. And the report is the product of interviews that you conducted with Maynes, Burton, and Campbell on February 18, 2004. Right?
A. Yes, it is.
Q. Okay. Did you ever talk with either Maynes, Campbell, or Burton about the events of December 27, 2003 at any time after February 18, 2004 and before you wrote this report on May 5, 2004?
A. Clarification. You're asking if I talked to these





guys; Maynes, Burton, Campbell?
Q. Any one of them between after the 18th of February but before you wrote this report about the events of December 27, 2003.
A. Well, I don't believe I talked to Maynes again. I'm sure I talked to Burton and Campbell at some point during that.
Q. So at least with respect to Maynes and whatever Maynes said to you, it was limited to what he said to you on February 18, 2004. Right?
A. Yeah. Also, I spoke with Maynes on the phone on 1/28/04.
Q. Okay. All right.
A. So I spoke with Maynes a couple times; but if you're asking me if I spoke with him after the 18th, no, I don't believe I did.
Q. Now, when you spoke to him either on the 28th of January, 2004 or February 18, 2004, did you make any note of the conversation with Maynes?
A. The 28th -- well, the 28th I set up the meeting for the 18th; so, yes, I did. I must -- I wrote a note on paper indicating he was coming in on the 18th. The 18th I did make notes, yes.
Q. And where are they?
A. I don't have them any longer.





Q. Okay. And when you were doing this investigation, can you tell me what you understood to be your task? What was your purpose in asking the questions of these three people? Was it to conduct an internal investigation?
A. Yes. I'm -- yes, it was. It was -- well, it was a first step. Basically, there was a complaint allegation received. I in turn was instructed to contact Maynes to find out, in fact, what it is and if it can be resolved.
Q. Well, I want to be careful with the terminology. Did you consider yourself to be starting an internal investigation when you talked to Maynes on February 18, 2004?
A. No. I wouldn't say I did.
Q. Okay. It was more of an attempt to resolve a problem -- perceived problem between Maynes and two officers of the Westerly Police Department. Right?
A. That's correct, yes.
Q. Okay. And as of February 18, 2004, you felt that the problem had been resolved, didn't you?
A. At the end of the interview with Maynes February 18th --
Q. Yes.
A. -- 2004? Well, I didn't feel at that point it was resolved. Maynes if it was not resolved and -- and he wasn't satisfied, he was, in fact, to let me know. I didn't

hear from him after that point, so I had assumed, yes, it was resolved.
Q. Well, let me just take a moment here and look. You wrote in what has been marked as No. 1 on Page 3 last paragraph, "At the conclusion of the meeting, Maynes indicated that he was satisfied with our meeting and indicated that he felt more comfortable with the incident." You wrote that. Right?
A. That's correct. Yes, I did.
Q. Okay. And because Maynes indicated that to you, you felt on February 18th that the problem was probably resolved between Maynes and Burton and Campbell. Right?
A. No. I -- no. I wouldn't say I felt it was resolved. If you read the next sentence, it goes on. I told him to let me know if, in fact, he was not satisfied with the outcome. And I didn't hear from him, so, I mean, I wouldn't say I was completely satisfied this thing was resolved. No, I did not.
Q. Okay. So when did you make any notes of the conversation with Maynes? Did you do it on February 18th?
A. February 18th I did the meeting.
Q. And when did you discard the notes that you had kept?
A. After I did this report.
Q. So you actually had notes available to you when you





made this report?
A. Yes, I did.
Q. Okay. You knew when you made this report that Maynes had instituted a lawsuit. Right?
A. I don't know if it was a lawsuit or he filed a civilian complaint. I'm not quite sure. I'd have to look at the report to see. I don't know if I knew there was a lawsuit. It would indicate in the report if, in fact --
Q. You knew?
A. Yeah. Basically, on 5/4 I was advised that a complaint had been received by town hall. I didn't know anything of a lawsuit at that point.
Q. Okay. You didn't know what kind of complaint had been received?
A. Well, yeah, a civilian complaint form. A formal complaint form must have been received by the town hall, I assume; but I didn't know if that's your question. No.
Q. And not withstanding you knew that a formal complaint had been filed, you discarded the notes that you kept of the conversation between you and Maynes on February 18, 2004?
ATTY. COLUCCI: Objection to the form of the question. You can answer.
Q. (By Atty. Bradley) Okay. You can answer?
A. Repeat the question. You're asking if I discarded





them before this 5/4 date?
Q. You just testified earlier that you discarded those notes after you wrote that report?
A. That's correct, yes.
Q. Okay. Why did you do that?
A. Because I -- well, it was a legal pad. I made some notes at the interview. I did the report, threw the notes away.
Q. So do you recall what was on the notes?
A. No, I do not. I mean, exact, no, I don't.
Q. Okay. How many pages of notes were there?
A. One. It was a legal pad. It wasn't even a full page.
Q. Did you write any quotes from Maynes on the legal pad?
A. Yes, I did.
Q. Do you remember what those quotes were?
A. They would be in this report. I don't know off the top of my head now.
Q. Okay. Well, let's take a look at Exhibit No. 1. As you sit here today, June, 2005 --
A. Uh-huh.
Q. -- are you able to remember anything that Maynes said to you in February of 2004 without reference to this report?





A. No. Well, I can -- no. I'm not going to try to come up with things he said to me. I'd like to reference a report.
Q. So you couldn't out of your own memory testify with any accuracy as to what Maynes said to you on February 18, 2004. Is that true?
A. After referring to the report, I could.
Q. Okay. So your recollection would be refreshed by referencing the report?
A. That's correct.
Q. And as you sit here today, you're going to insist on the accuracy of everything that you wrote in this report?
A. That's correct.
Q. Okay. You were asked to bring with you today certain materials having to do with the transaction where you bought a Porsche. Right? Weren't you?
A. That's correct. Yes.
Q. Okay. And were you instructed not to obey that subpoena?
ATTY. COLUCCI: Objection. Let me make a statement now and get this out of the way.
ATTY. BRADLEY: Mark that while he's making it. Well, I guess you have to type his statement.
ATTY. COLUCCI: This portion of the subpoena as well as any questions that you may or may not ask about it

10:16:28 we object to, and I will instruct him not to answer or
10:16:33 provide those documents if they exist to you.
10:16:37 However, based on some discussions you and I had
10:16:42 previously, Mike, I guess you still intend to inquire
10:16:46 somewhat into this area. I just want to make a few comments
10:16:49 about it now because I think we'll cover the issue.
10:16:55 Obviously, transaction about some automobile
10:17:01 purchase is not a part of Mr. Maynes' complaint. It is at
10:17:08 best a collateral or peripheral issue that you are inquiring
10:17:14 about or may inquire about today. Therefore, I don't think
10:17:19 it's proper, nor do I think you have the authority to
10:17:23 subpoena or otherwise to inquire at this deposition about
10:17:28 it.
10:17:28 Having said that, however, I would concede that it
10:17:34 may be something you could inquire into under Rule 608 with
10:17:41 specific incidents of conduct that may go to truthfulness as
10:17:45 you have framed the rumors you've heard or the allegations
10:17:51 to me. However, that rule is pretty solid and pretty clear
10:18:00 that while you may ask about the issue itself, whatever it
10:18:04 is you want to ask what he did, whatever the specific
10:18:06 instance of conduct it is that you believe you have
10:18:09 knowledge of, I guess you are entitled to ask him that; and
10:18:13 you are entitled an answer to that question.
10:18:18 However, the rule is just as clear as well as the
10:18:23 First Circuit that extrinsic matters may not be inquired





10:18:29 into, extrinsic evidence. In essence, you can ask him if he
10:18:33 committed whatever act it is you believe he committed, but
10:18:35 extrinsic evidence of that is not permitted; and because it
10:18:39 is a completely peripheral issue even though this is a
10:18:44 deposition, there is no legitimate argument that you can
10:18:50 make in my opinion -- and I know we'll disagree on this --
10:18:56 that somehow inquiry into those areas might lead to
10:19:01 admissible evidence because Rule 608 is quite clear; so on
10:19:06 that basis I don't even believe you have a right to ask it
10:19:10 at a deposition. It's no different from sitting a witness
10:19:15 down and asking him, for example, have you ever cheated on
10:19:18 your wife, have you ever not reported all your income on tax
10:19:22 returns. You just can't go into those areas. A license to
10:19:25 take a deposition does not -- especially being in federal
10:19:28 court -- does not give you unfettered access to every part
10:19:33 of a person's personal life; and so I'm not going to permit
10:19:37 any questions beyond your asking him whether he committed
10:19:42 whatever specific act you believe he committed. He'll
10:19:48 answer that question, but anything else about that that may
10:19:52 be extrinsic to that, the records, anything that may be
10:19:56 extrinsic, I'm going to instruct him not to answer; and if
10:20:01 we need to battle it out at some point in the future, so be
10:20:05 it. But I think we're pretty solid on that, and that's what
10:20:10 -- how it's going to be from our end. If you prove me
10:20:13 wrong, you prove me wrong; but I think we're pretty solid on





10:20:16 that.
10:20:17 That's my position. That's not going to change
10:20:20 today, and I know you may disagree. Maybe I have convinced
10:20:25 you otherwise. I don't know so --
10:20:28 ATTY. BRADLEY: Are you done?
10:20:30 ATTY. COLUCCI: Yup.
10:20:31 ATTY. BRADLEY: Okay. Let's mark this.
10:20:31 (Plaintiff's Exhibit 2, subpoena, was marked for
10:20:47 identification.)
10:20:47 ATTY. BRADLEY: For the record, Plaintiff's Exhibit
10:20:49 No. 2 is a subpoena directed to Shawn Lacey. Looks like it
10:20:55 was served on Sergeant Lacey on May 16, 2005. Page 1 is the
10:21:04 subpoena. The second page is a continuation page
10:21:07 representing the things that Sergeant Lacey was directed to
10:21:11 bring to his deposition today. Page 3 is the notice of
10:21:15 deposition dated May 6, 2005. Page 4 is the second page of
10:21:22 the notice of deposition.
10:21:27 Q. (By Atty. Bradley) Now, Sergeant Lacey, did you
10:21:30 bring with you here today any -- all notes made in
10:21:36 conjunction with interviewing anyone referable to the
10:21:39 incident involving William Maynes, Arthur Burton, and James
10:21:43 Campbell on December 27, 2003?
10:21:45 A. I brought my report.
10:21:46 Q. Okay. Is that all you brought?
10:21:48 A. That's right. Correct, yes.





10:21:49 Q. Did you bring with you copies of all records in
10:21:52 your possession referable to the purchase of a 1998 Porsche
10:22:07 Carrera, model 942, V.I.N. WPOCA2998WS340842 including but
10:22:08 not limited to copies of any purchase and sales agreements
10:22:11 or other indicia of payment for same including copies of
10:22:15 cancelled checks both sides?
10:22:17 A. No, I did not.
10:22:18 Q. Why not?
10:22:19 ATTY. COLUCCI: Objection. Don't answer that based
10:22:21 on my prior statement.
10:22:22 Q. (By Atty. Bradley) Did you bring with you any
10:22:24 paperwork referencing the value of the 1998 Porsche Carrera,
10:22:37 model 942, V.I.N. WPOCA2998WS340842 generated either in
10:22:38 conjunction with the purchase or in conjunction with any
10:22:43 insurance claim made referable to the vehicle?
10:22:45 A. No, I did not.
10:22:46 Q. Did you bring any copies of any paperwork
10:22:49 associated with the registration of the vehicle with the
10:22:50 Rhode Island Department of Motor Vehicles?
10:22:52 A. No, I did not.
10:22:53 Q. Okay. And why not?
10:22:55 ATTY. COLUCCI: Same instruction. Also add
10:22:58 attorney client to that particular objection.
10:23:02 Q. (By Atty. Bradley) Now, did you, in fact, buy a
10:23:09 Porsche Carrera, model 942, from Remskip Auto?

10:23:11 ATTY. COLUCCI: Objection. Same instruction.
10:23:13 That's extrinsic. Don't answer the question.
10:23:18 Q. (By Atty. Bradley) Did you make an insurance claim
23:20 with respect to the burning up of a Porsche that was under
:23:26 your ownership?
10:23:27 ATTY. COLUCCI: Objection.
10:23:33 ATTY. BRADLEY: Do you have a reason on this one?
10:23:35 ATTY. COLUCCI: Did he make an insurance claim?
10:23:37 ATTY. BRADLEY: Yes.
10:23:37 ATTY. COLUCCI: Same instruction.
10:23:39 ATTY. BRADLEY: What is that instruction for the
10:23:40 record just so Judge Torres (phonetic) understands it.
10:23:43 ATTY. COLUCCI: It's an extrinsic question you're
10:23:47 asking. Certainly making a claim is not a supposedly bad
10:23:51 act.
10:23:52 ATTY. BRADLEY: Okay. Are you done?
10:23:57 ATTY. COLUCCI: Yes.
10:23:57 ATTY. BRADLEY: Thank you.
10:23:58 ATTY. COLUCCI: And I don't want to waive the
10:24:00 previous objection by letting him go down the path by
10:24:03 answering some questions that I believe are extrinsic to the
10:24:06 ultimate question which I think, as you said, you're free to
10:24:10 ask him that.
10:24:10 ATTY. BRADLEY: What am I free to ask him, by the
10:24:12 way? I'm not sure what you are letting me ask him.





10:24:15 ATTY. COLUCCI: I'm basing this on prior things you
10:24:18 told me.
10:24:19 ATTY. BRADLEY: Why don't you just answer the
10:24:20 question as to what you're going to let him answer. You
10:24:22 already put an objection on the record before I started my
10:24:25 questions that lasted four minutes. I timed it on my cell
10:24:27 phone so --
10:24:29 ATTY. COLUCCI: I'm trying to shorten the process
10:24:30 for everyone.
10:24:31 ATTY. BRADLEY: Could you do that?
10:24:31 ATTY. COLUCCI: I didn't want to have to keep doing
10:24:37 this.
10:24:37 ATTY. BRADLEY: Tell me what kind of questions
10:24:37 you're going to allow me to ask him this morning about the
10:24:38 purchase of the Porsche.
10:24:38 ATTY. COLUCCI: I'll try to explain it again.
10:24:42 ATTY. BRADLEY: Don't take four minutes this time,
10:24:43 okay, because I'm paying for the deposition.
10:24:45 ATTY. COLUCCI: If you keep interrupting me, it may
10:24:45 take eight minutes.
10:24:48 ATTY. BRADLEY: Well, if it does --
·24:49 ATTY. COLUCCI: You have made references that you
24:51 believe that there was some type of fraudulent --
10:24:55 ATTY. BRADLEY: Okay. I'm going to stop. I'm
10:24:55 going to keep on asking questions. I'm not going to listen





10:24:59 to you lecture. I'm going to ask questions. You instruct
10:25:00 him not to answer the question I ask him. I'm not going to
10:25:02 sit here and listen to a lecture from you.
10:25:05 ATTY. COLUCCI: You asked me --
10:25:06 ATTY. BRADLEY: I'm done.
10:25:08 Q. (By Atty. Bradley) Sergeant Lacey, I'm going to
10:25:08 ask you a question now. Okay? Are you ready for it?
10:25:13 A. Yes.
10:25:13 Q. Did you buy a 1998 Porsche from Remskip Auto?
10:25:17 ATTY. COLUCCI: Objection. Don't answer it.
10:25:18 Q. (By Atty. Bradley) Okay. Did you pay --
10:25:21 ATTY. COLUCCI: Let me just say that all my
10:25:23 instructions are based on the previous explanation that I
10:25:26 gave at the outset.
10:25:28 ATTY. BRADLEY: That's great. Thanks. We got you.
10:25:32 Everybody understands.
10:25:34 ATTY. COLUCCI: You're welcome. I'm glad you do.
10:25:36 ATTY. BRADLEY: Good.
10:25:37 Q. (By Atty. Bradley) Now, did you pay -- did you
10:25:39 misrepresent on Rhode Island Department of Motor Vehicles
10:25:45 paperwork how much you paid for the Porsche that you bought?
10:25:49 ATTY. COLUCCI: That you can answer.
10:25:52 A. No, I did not.
10:25:53 Q. (By Atty. Bradley) So you did buy a Porsche?
10:25:55 ATTY. COLUCCI: Objection. Don't answer that one.





10:25:57 Same instruction.
10:25:58 Q. (By Atty. Bradley) How much did you pay for the
10:26:00 Porsche that you bought?
10:26:03 ATTY. COLUCCI: Objection. Same instruction.
10:26:04 Q. (By Atty. Bradley) Did you fill out paperwork in
10:26:07 association with the purchase of a 1998 Porsche?
10:26:11 ATTY. COLUCCI: Same instruction.
10:26:12 ATTY. BRADLEY: Which is don't answer?
10:26:14 ATTY. COLUCCI: Yes.
10:26:15 Q. (By Atty. Bradley) Okay. Have you been -- are you
10:26:19 aware of any investigation being conducted about you by the
10:26:22 Rhode Island State Police?
10:26:24 ATTY. COLUCCI: Same instruction.
10:26:27 Q. (By Atty. Bradley) Have you had any discussions
10:26:29 with the Westerly Police Department concerning any
10:26:33 investigation of you by the Rhode Island State Police?
10:26:36 ATTY. COLUCCI: Same instruction.
10:27:04 Q. (By Atty. Bradley) Sergeant Lacey, have you ever
10:27:06 been arrested?
10:27:07 A. No, I have not.
10:27:08 Q. Have you ever been investigated in conjunction with
10:27:15 any crime?
10:27:16 A. No, I have not.
10:27:17 Q. Do you use cocaine?
10:27:18 ATTY. COLUCCI: Objection. I guess you can answer

that one.
A. No, I do not.
Q. Have you ever used cocaine?
A. No, I have not.
Q. Have you ever used any illegal drug?
A. Marijuana.
Q. When did you do that?
A. High school.
Q. Do you derive any income from any source other than your occupation as a Westerly police officer?
ATTY. COLUCCI: Objection.
ATTY. BRADLEY: Are you going to instruct him not to answer it?
ATTY. COLUCCI: He can answer that question, but I'll tell you what. If you go further down the road -- he's not a party yet anyway. I am going to instruct if you keep going down that road.
ATTY. BRADLEY: Why don't we wait until I get there.
ATTY. COLUCCI: Maybe you won't now.
Q. (By Atty. Bradley) Do you have any sources of income outside of your employment with Westerly Police Department?
A. Yes, I do.
Q. What do you do?





A. I have a building company.
Q. And do you have any partners in that building company?
A. Yes, I do.
Q. Who are they?
A. Stano Trombino.
Q. He's a Westerly police officer too. Correct?
A. That's correct.
Q. Who else?
A. That's all.
Q. And did Stano Trombino (phonetic) buy a Porsche, buy any cars from Remskip Auto?
ATTY. COLUCCI: Same instruction. Now we're going down that road. Let's stick to the case of William Maynes against the Town of Westerly.
ATTY. BRADLEY: How about you put on your objection on the record. Then we'll go on.
ATTY. COLUCCI: Same objection based on the prior statement I made earlier.
ATTY. BRADLEY: Let's be careful because sometimes you object and don't instruct him to answer. I'd appreciate if you're going to instruct him not to answer just to verbalize your instructing him not do. Okay? Can you do that?
ATTY. COLUCCI: I think I just did.





ATTY. BRADLEY: Have you instructed him not to answer a question about whether Stano Trombino bought a car from Remskip?
ATTY. COLUCCI: Yeah.
ATTY. BRADLEY: Okay. Good.
Q. (By Atty. Bradley) Just so I'm clear on this, at one point in this deposition you said you were conducting an internal investigation in February of 2004 when you talked to Maynes, and then at another point you said it was more like a mediation. Which was it?
ATTY. COLUCCI: Objection to the form. You can answer.
A. No, I did not. You asked me what this report was in reference to, and I told you Internal Affairs Investigation 04-17.
Q. (By Atty. Bradley) So --
A. At the time when I conducted my investigation of Maynes, yes, it was a mediation. It was not an Internal Affairs investigation at that point.
Q. Okay. And when did it become -- did you participate in an Internal Affairs investigation of Maynes?
A. No, I did not. This is my only participation right here.
Q. Okay. When you were asked -- involved in asking questions of Burton, Campbell, and Maynes, did you ever in





conjunction with your questioning check the dispatch system at the Westerly Police Department?
A. What -- clarify. What do you mean check the dispatch system?
Q. Did you ever -- are you aware of whether or not as we -- and this is referencing today. As we sit here today, are you aware of whether or not there's a question in this case whether Burton ever called in the stop of Maynes while he had Maynes stopped on the side of the road?
A. Yes, I have.
Q. And what is your understanding of that controversy?
ATTY. COLUCCI: Well, only outside of what you may have learned from me.
THE WITNESS: That's all I know is what I learned from you.
ATTY. COLUCCI: Don't answer that.
Q. (By Atty. Bradley) So you do know that Maynes is maintaining that he was stopped, and nobody, either Burton or Campbell, notified the police department that they had, in fact, stopped him. You do know that?
A. From Mr. Colucci, yes.
Q. Now, when you were doing your questioning, did you ever check to see if, in fact, Burton or Campbell had ever called in to notify the department that they had stopped Maynes on the side of the road?

10:32:13 A. No, I did not.
10:32:14 Q. Okay. When you were asking your questions, did
10:32:16 anyone provide you with an interoffice memorandum to Chief
10:32:22 Baker from Corporal Williams dated January 31, 2004?
10:32:27 A. I'm sure I did read that, but I don't recall when,
10:32:32 if it was before or after; but I'm pretty sure I read it.
10:32:36 Q. Before or after when?
10:32:37 A. The interview with Maynes.
10:32:39 Q. Okay. So you probably read it before May of 2004
10:32:46 when you wrote your report which is Plaintiff's No. 1.
10:32:49 Right?
10:32:51 A. Probably. That's correct.
10:32:53 Q. And you read it before you decided to discard
10:32:56 whatever notes you had kept of the Maynes interview. Right?
10:33:01 A. Correct.
10:33:02 Q. And just to make sure I understand, did you also
10:33:05 take notes of the questioning that you engaged in with
10:33:10 Officers Campbell and Burton?
10:33:12 A. No, I did not.
10:33:13 Q. Okay. So the only notes you kept were notes of
10:33:16 what Maynes had said?
10:33:17 A. Yes.
10:33:18 Q. Okay.
10:33:19 A. That's correct.
10:33:20 Q. Why didn't you keep any notes of what Burton or





10:33:23 Campbell said?
10:33:24 A. Because they had done a report on it, so there was
10:33:27 -- they had documented it in their report. There was no
10:33:30 need for me to take notes.
10:33:32 Q. Okay. So you didn't feel that there might be a
10:33:36 chance that they might actually say something in their
10:33:39 interview with you that was inconsistent with the reports
10:33:43 they made?
10:33:43 A. Would be possible. You're asking me that -- would
10:33:47 I take notes if that's --
10:33:51 Q. When you decided -- you did make a conscious
10:33:55 decision not to take any notes of what Burton and Campbell
10:33:58 said. Right?
10:33:58 A. That's correct.
10:33:59 Q. Okay. And that was because they had already put
10:34:07 things on paper about what happened on December 27, 2003.
10:34:11 Right?
10:34:12 A. There was a report completed. That's correct.
10:34:13 Yes.
10:34:13 Q. Okay. And did either of these officers in their --
10:34:20 in any written materials that you reviewed make any
10:34:26 reference to having called in to the Westerly Police
10:34:33 Department while they had Maynes pulled over on the side of
10:34:35 the road?
10:34:37 A. I -- to be honest with you, I don't recall. I'd





10:34:40 have to read this, go through this and/or read their
10:34:43 reports. I don't --
10:34:43 Q. Okay. Is the internal investigation of Burton and
10:35:07 Campbell now concluded?
10:35:10 A. I have no idea.
10:35:12 Q. Okay. But your -- what we have marked as Exhibit
10:35:17 No. 1 although it started out as a document -- or although
10:35:20 your making of that document was in conjunction with a
10:35:25 mediation, you were aware on or about May 5, 2004 that there
10:35:33 was a complaint that was registered at the town hall by
10:35:36 Maynes. Right?
10:35:38 A. Let me just check the date. It was May 4th.
10:35:41 That's correct.
10:35:41 Q. Okay. Did anyone tell you to destroy your notes?
10:35:45 A. No.
10:35:48 Q. And you're sure that you destroyed them after you
10:35:50 wrote this report?
10:35:51 A. That's correct. Yes.
10:35:53 Q. How long after you wrote the report did you destroy
10:35:57 the notes?
10:35:57 A. As soon as I wrote the report.
10:35:59 Q. Okay. Are you familiar with the documents that are
10:36:17 -- can be generated through the Westerly Police Department
10:36:21 dispatch system?
10:36:25 A. Say that again. Am I familiar with what?





10:36:28 Q. With the kinds of documents that can be generated
10:36:30 in conjunction with the Westerly Police Department dispatch
10:36:33 system?
10:36:36 A. Somewhat familiar with them, yes.
10:36:37 ATTY. BRADLEY: Would you mark these.
10:36:37 (Plaintiff's Exhibit 3, dispatch record, was marked
10:36:53 for identification.)
10:36:53 Q. (By Atty. Bradley) Sergeant, I have marked as
10:36:55 Plaintiff's Exhibit No. 3 a series of documents -- one, two,
10:36:59 three -- four pages of documents, and I'm -- I have
10:37:09 characteristically referred to them as records from the
10:37:11 Westerly Police Department dispatch system. You may have
10:37:15 another name for them. Would you take a look at those for a
10:37:17 minute?
10:37:18 A. Sure. Yes.
10:37:34 Q. Do you know Renato Garcia?
10:37:39 ATTY. COLUCCI: Objection. Same instruction as
10:37:40 before.
10:37:41 ATTY. BRADLEY: What is that?
10:37:43 ATTY. COLUCCI: Not to answer.
10:37:43 ATTY. BRADLEY: Okay. Just wanted to make sure.
10:37:47 Q. (By Atty. Bradley) Plaintiff's No. 3, what kind of
10:37:50 records are those in your vernacular in your parlance?
10:37:57 A. This is the call log. This is what we call it.
10:37:59 The call log from 12/27/03 from -- gives an approximate time

13:37 which is obviously 1:37 to 14:50 which is 2:50.
Q. Okay. So you know I -- I'm -- I can't -- I'm not maintaining to you that that's a complete record of the call log between any particular times.
A. Okay.
Q. And there won't be any questions concerning if whether this is a complete record or not. I just wanted to know in general if you understood what those records were.
A. Yes, I do.
Q. Okay. I want to ask you some questions about some of the things that appear on these entries. Okay?
A. Uh-huh.
Q. And just, for example, the first entry which has nothing to do with this case -- I'm just asking questions about what different entries mean and how they get there.
A. Okay.
Q. There is -- there are several headings above the entry. One is called "call." One is called "number." One's "time." One's "call reason." One's "action." One's "priority," and one's "duplicate." Do you see that?
A. Yes, I do.
Q. And then down below under the narrative section, there is a date that happens to be 12/27/03, 13:37, Mills, Howard. Right?
A. That's correct.





Q. Now, Howard Mills on December 27, 2003 was a dispatcher for the Westerly Police Department. Right?
A. That's correct.
Q. And he is today too. Right?
A. That's correct.
Q. And the number 13:37 next to Mills, Howard, do you know what that represents?
A. Time.
Q. That represents the time that Howard Mills took a call. Right?
ATTY. COLUCCI: Objection. You can answer.
A. Okay. Yeah. I -- yes. It's either when he put the call in or took the call. I'm not quite sure what exactly -- what, you know, that actual time represents but --
Q. Okay. You're not sure what it represents?
A. No, no. It's either the time he took the call or it was entered, you know. I don't know. I don't know other than that.
Q. Okay. It doesn't represent the time of the incident, does it?
A. I don't know. I'd have to -- I can't answer that to any certainty.
Q. Okay. Well, let me ask you something you probably can answer with certainty. These -- this entry on





Plaintiff's No. 3, the first entry on the page under "call number 03-17551," that is an entry that contains information on it. Correct?
A. That's correct.
Q. Now, one thing that it has on it is ARVD-13:42 and CLRD-: -- did I -- let's start again. ARVD-13:42:00 and CLRD-14:08:00. Right?
A. That's correct.
Q. What does ARVD mean?
A. Arrived.
Q. Does that mean that that's representing what time the officer arrived wherever it is he's reporting?
ATTY. COLUCCI: Objection. You can answer.
A. Yes, it does.
Q. (By Atty. Bradley) And does CLRD represent the time that the officer left the scene?
ATTY. COLUCCI: Objection. You can answer.
A. Yes, it does.
Q. (By Atty. Bradley) Okay. And what does the number 13:37 under the heading "time" represent?
A. Time of the call.
Q. The call into the station?
A. I don't know whether that's when they log it in or -- I don't know. I mean, when we reference them when I review them, that's time of call. Whether it's when it came





into the station or when they log it in, I couldn't answer that with any certainty either.
Q. Okay. Let's look at Page 4 of this document. It's not going to be Page 4. On the third page of Plaintiff's No. 3 for identification, there is an entry under "call number 03-17572. Right?
A. That's correct.
Q. Okay. And once again, it has arrived 14:50, cleared 15:47. Right?
A. That's correct.
Q. So that would mean the officer that reported this incident in said he arrived on the scene at 14:50 otherwise known as 2:50 in the afternoon. Right?
ATTY. COLUCCI: Objection. You can answer.
A. That's correct.
Q. (By Atty. Bradley) And that he cleared the scene almost an hour later at 15:47 military time which is 3:47. Right?
ATTY. COLUCCI: Objection. You can answer.
A. Well, he cleared the call at that time. That doesn't mean he cleared the scene. I mean, he could have cleared the scene, I don't know, went to the station. But whenever he was completed with the call. If there was a follow-up investigation, he would stay into the call until, in fact, the call was cleared.

Q. (By Atty. Bradley) Okay. So you're changing your testimony because earlier did you not say that cleared means when he left the scene?
ATTY. COLUCCI: Objection.
A. No, I did not. I said when he clears the call, when he clears out -- I mean, he could be clearing the call when he leaves the scene, but it may not be, you know -- I don't -- I -- it's up the actual incident.
Q. Okay. Now, once again, under time there is an entry 14:50 which is ten of three. Right?
A. That's correct.
Q. And on this entry next to Mills, Howard there is a number 1546. That also represents a time?
A. Yes, it does.
Q. What does that time represent?
ATTY. COLUCCI: Objection. You can answer.
A. I can't answer with any certainty. It's either -- I don't know. It's when it was logged in or -- I don't know.
Q. (By Atty. Bradley) Okay. Are you familiar with the protocols that the dispatchers are supposed to adhere to in performing their job duties with the Westerly Police Department?
A. To some extent.
Q. Isn't it true that they are supposed to log in any





calls by officers as close to the time the call comes in as possible?
ATTY. COLUCCI: Objection. You can answer.
A. Yes, it is.
Q. (By Atty. Bradley) Now, according to the protocols engaged in or followed by the Westerly Police Department, are officers supposed to call in the stop of a motor vehicle before they even get out of their car to approach the vehicle they stopped?
A. Yes, they are.
Q. Are you aware of whether Burton did that?
A. No. Well, I am now in speaking with Attorney Colucci, but prior to that --
Q. Okay. You're aware that he didn't. Right?
ATTY. COLUCCI: Objection.
A. Now I am, yes.
Q. (By Atty. Bradley) Okay. Are you aware that someone from Westerly Police Department ran a check on Maynes' license and registration with the Rhode Island State Police some 27 minutes before he was ever stopped in the first place?
ATTY. COLUCCI: Objection.
Q. (By Atty. Bradley) Are you aware of that?
ATTY. COLUCCI: Objection.
A. I am now, yes.





Q. (By Atty. Bradley) And are you aware that Officers Maynes and Burton spoke on their cell phones approximately --
A. Officer Maynes?
Q. Excuse me. Thank you. I do that sometimes. I appreciate the help.
Are you aware that Officers Burton and Campbell talked on their cell phones somewhere between three and four minutes before that initial check of Maynes' license and registration was run?
ATTY. COLUCCI: Objection.
A. I'm not aware of that, no.
Q. (By Atty. Bradley) Are you aware that Burton and Campbell spoke on their cell phones together at about the same time that Maynes was pulled over?
ATTY. COLUCCI: Objection.
A. I'm not aware of that, no.
Q. (By Atty. Bradley) Okay. According to what you understand about appropriate -- well, let me ask you: How long have you been a police officer?
A. Eighteen and a half years.
Q. And you went through training at the police academy?
A. That's correct. Yes.
Q. And you've had, you know, educational courses since





you became an officer, updates to bring you up to date on changes in the law and everything?
A. Yes.
Q. Okay. Was there ever a bulletin or any other kind of information dispensed throughout the Westerly Police Department that would relate to the case against Westerly Police Department and Officer Fiori (phonetic) as that would relate to proper procedures in doing an automobile investigatory stop?
A. I don't recall. There may have been, but I don't recall one offhand.
Q. Are you aware that in this case Burton it is alleged -- well, are you aware in this case that Burton himself admits that he kept on repeating to Maynes that Maynes was not under arrest?
A. Yes, I am.
Q. Okay. Is that something that Westerly Police Department officers are instructed to tell detainees when they are detained?
A. No.
Q. Okay. If, in fact, Burton and Campbell or Burton or Campbell determined to pull Maynes over on December 27, 2003 solely because of the perception of one or both of them that Maynes had left a baggy with the residue of either marijuana or cocaine in Campbell's cruiser the prior May in

conjunction with the transport of Maynes into the station, would that fact alone according to the policies of the Westerly Police Department justify an investigatory stop of Maynes on December 27, 2003?
ATTY. COLUCCI: Objection. You can answer.
A. No, it would not.
Q. (By Atty. Bradley) No, it would not?
A. No.
Q. Okay. What is your understanding from talking with Burton as to the reason why Maynes was stopped in the first instance on December 27, 2003?
A. I'd like to refer to my report to answer that because I don't want to say something that's --
Q. Sure.
ATTY. BRADLEY: Could we go off the record while he's doing that.
(An off-the-record discussion was held.)
Q. (By Atty. Bradley) Sergeant Lacey, ready?
A. I'm ready.
ATTY. BRADLEY: Would you read the question back.
(The question was read aloud by the court reporter.)
A. Again I'll refer to the report. Burton indicated that Maynes appeared very nervous moving around inside his vehicle. Burton indicated he went back up to Maynes and





asked him why he was reaching into his back pocket. Maynes indicated he didn't know why. At this point Burton had Maynes step out of the vehicle, conducted a pat down of him for officer safety. I went on to explain to Maynes how it wasn't an uncommon practice.
Q. You explained what practice?
A. It wasn't an uncommon practice.
Q. Okay.
A. Burton indicated that when Maynes placed his hands on the cruiser to pat him down, he continued to take his hands off the cruiser, continued to move around. Burton placed handcuffs on him. At this point he was not listening to his instructions. Burton was trying to pat him down. He asked Maynes if he could check his wallet. Maynes said he didn't care, found a Viagra pill inside of the wallet and some money. At that point according to Burton, Campbell arrived on scene. Handcuffs were taken back off Maynes. According to Burton, he was placed into the rear of Burton's cruiser, advised he wasn't under arrest. He asked if he could search his vehicle. Maynes indicated go ahead.
After checking the vehicle, both officers indicated Maynes was released from the scene. That's basically --
Q. Would you agree with me that everything you just read refers to what happened after Maynes had already been stopped?





A. That's correct. Yes.
Q. And the question was: Do you -- are you aware of why it is maintained by Burton that Burton stopped him in the first place?
A. You're asking me why Burton stopped him?
Q. Yes. Why Burton stopped him.
A. I don't see it in here, but it's my recall -- I believe he stopped him for a stop sign violation.
Q. Okay.
A. I could be wrong. I mean, I think that's what it was, stop sign violation.
Q. Well, Burton had testified as to several reasons for stopping Maynes.
A. Okay.
Q. One of them was maintaining a speed of 50 miles an hour in a 40-mile-an-hour zone. Does that -- do you recall that now?
A. If you're saying that's one of his reasons. I thought it was a stop sign, but if I'm wrong, maybe --
Q. All you remember is that Burton said something about him running a stop sign. Right?
A. Uh-huh.
Q. Correct?
A. Yes.
Q. Okay. Do you recall how it came to pass that





Campbell arrived on the scene of the stop of Maynes on December 27, 2003?
A. Why he ended up there you mean?
Q. How -- do you recall how it came to pass that Campbell arrived on the scene of the traffic stop of William Maynes on December 27, 2003?
A. To be honest with you -- let me just peruse this quick. I don't know if he was sent or -- I have no idea, but he arrived as a back up on the scene. I know that. Why he was sent or how he ended up there, I don't know.
Q. Do you remember what Campbell said, if anything, to you about how it came to pass that he arrived on the scene?
A. As to how he ended up on the scene, no.
Q. And we both know that he arrived in a vehicle. Right?
A. Yes. That's correct.
Q. Okay. And what I'm trying to get at is whether you remember anything about what Campbell said in terms of how he knew to show up there at all on December 27th?
A. No. I don't know that. No.
Q. And it's not in Exhibit No. 1 which is your report, is it?
A. No, I don't believe so.
Q. Okay. And it wouldn't be in any note you took of any conversations with Campbell because you didn't take any

10:56:21 notes of any conversation?
10:56:22 A. That's correct. Yes.
10:56:23 Q. Okay. And were you aware on either January 28th or on February 18th of 2004 that Maynes was at all concerned about the fact that Campbell had shown up on the scene?
10:56:46 A. Back up. You're asking me between the 28th --
10:56:48 Q. Well, let me just rephrase it.
10:56:53 On either the 28th of January when you talked to Maynes on the phone --
10:56:57 A. Uh-huh.
10:56:58 Q. -- or on February 18, 2004 when you talked to Maynes in person, on either of those occasions, did you become aware that there had been a prior history, if you will, between Campbell and Maynes?
10:57:15 A. I don't even know. Can I refer to this?
10:57:17 Q. Sure.
10:57:42 A. I would say, no, I did not.
10:57:44 Q. Okay. Were you aware either on February 18, 2004 or January 28, 2004 that before Maynes had been stopped by Burton, he had talked to Burton about directions to a street on -- I guess it's Erso Drive (phonetic)?
10:58:16 A. Yes, I did. I was aware of that.
10:58:18 Q. Were you aware on either December or -- excuse me -- on January 28th of 2004 or February 18, 2004 that Campbell had expressed any concern to Maynes during the stop





10:58:34 on December 27, 2003 about a prior incident between the two of them?
10:58:40 A. Yes. Maynes indicated that to me.
10:58:42 Q. Okay. So you were aware of some prior history or engagement between Maynes and Campbell when you wrote your report on May 5, 2004?
10:58:58 A. Yes, I was.
10:58:59 Q. Okay. And you were aware of that prior engagement between Maynes and Campbell on January 28, 2004, weren't you?
10:59:10 A. I don't -- I don't know if -- I don't think I was aware then. I was definitely aware on the 18th when I talked to Maynes, but I can't say that I was aware prior to the 18th of February.
10:59:22 Q. Okay. On February 18, 2004 you knew that there had been a prior engagement between Maynes and Campbell. Isn't that true?
10:59:41 A. Say that again.
10:59:42 Q. On February 18, 2004 --
10:59:44 A. Yup.
10:59:45 Q. -- you were aware that there had been a prior engagement, a prior stop, involving Campbell and Maynes the prior May, weren't you?
10:59:55 A. Only from what Maynes told me.
10:59:57 Q. But you were aware from Maynes that it had





11:00:00 happened?
11:00:00 A. Yes. That's correct. Well, Maynes -- yeah. Maynes indicated that the officer said something to him which would -- Maynes said to me that's the same guy that stopped him some time before or something.
11:00:10 Q. And did you ask Campbell any questions about that prior stop?
11:00:15 A. I don't recall if I did or not.
11:00:17 Q. Okay. Did you take -- mark down any notes about any conversations with Campbell about the prior stop?
11:00:24 A. No, I did not.
11:00:26 Q. Are you aware -- or were you aware -- excuse me -- on February 18, 2004 that when Campbell approached Maynes in December of 2003, December 27th, that when Campbell approached Maynes during that traffic stop that Campbell brought up issues concerning the prior stop?
11:00:59 A. No, I did not. Not until I talked to Maynes on the 18th.
11:01:02 Q. Okay. You became aware on February 18, 2004 that when Campbell approached Maynes on December 27, 2003 that Campbell had made reference to Maynes having put one over on him. Right?
11:01:23 A. Well, no. I wouldn't say put one -- I have in quotation, "got him last time but will not get him again."
11:01:30 Q. Okay. And did you ask Campbell anything about that





11:01:34 allegation of Maynes when you spoke with Campbell on February 18, 2004?
11:01:40 A. I don't recall if I did or not.
11:01:43 Q. Okay. Well, if you did, it's not in your report, is it?
11:01:50 A. Well, if I had, it would be in my report. If I didn't, then it would not be in my report; so there's nothing in here. I'm assuming I didn't.
11:01:57 Q. So you didn't ask -- when you interviewed Campbell on February 18, 2004, you just didn't ask him anything about Maynes' allegations about what was said to him by Campbell during the December 27, 2003 stop. Right?
11:02:14 A. That's correct.
11:02:15 Q. Okay. How come?
11:02:21 A. How come I didn't ask him?
11:02:23 Q. Yes.
11:02:23 A. I don't know. I was trying to mediate the situation. I mean, I wasn't investigating the situation. I was trying to mediate the situation between the parties so --
11:02:33 Q. Okay. What was your title on February 18, 2004 with the Westerly Police Department?
11:02:42 A. I believe the same I am now. Sergeant.
11:02:45 Q. Sergeant?
11:02:46 A. Correct.

Q. On February 18, 2004, did you have any supervisory powers or responsibilities with respect to Officers Burton and Campbell?
A. It depends if they were working. If they were working, I'm their supervisor. If they weren't, in fact, working, no, I'm not.
Q. So when Burton's home watching TV, you don't have any responsibilities as it would relate to him?
A. When he's working, I'm his supervisor. When he's home watching TV, yeah.
Q. You had supervisory responsibilities with respect to Burton and Campbell as they would relate to anything they might have done on December 27, 2003 when they stopped Maynes. Right?
A. No.
Q. Well, they were working on December 27, 2003 when they stopped Maynes?
A. I wasn't.
Q. You weren't?
A. No.
Q. Okay. So but when you're asking questions of Burton and Campbell on February 18, 2004, are you sitting here telling me that you didn't have any supervisory responsibilities with respect to either one of them?
ATTY. COLUCCI: Objection. You can answer.





A. Well, I mean, it depends if they were working. If I recall, Campbell was working, so I would say, yes, I'm his supervisor. Burton wasn't. I think Burton was working second shift that night, so, no, I wasn't the supervisor.
Q. (By Atty. Bradley) Okay. But you were responsible for Campbell?
A. I'm not -- I think Campbell was working. I'm not sure. I can't positively tell you that he was or not.
Q. All right. So if you find out that hypothetically Campbell holds up a Cumberland Farms while he's not working, you don't have any supervisory responsibilities with respect to what Campbell did when he was off duty?
A. No, I do not.
Q. Okay. I think I'm probably done. Can I see this?
This Exhibit No. 1 for identification which is your report dated May 5, 2004, did you write this solely relying on your memory?
A. No, I did not.
Q. What else did you use?
A. The notes that I had taken that I conducted when I talked to Mr. Maynes.
Q. Okay. Is that all?
A. Well, the notes and my memory, yes.
Q. Okay. I'm not trying to trick you, but I believe earlier you said that -- correct me if I'm wrong -- that you





also reviewed written materials that Burton and Campbell had generated. Is that -- did I get you wrong?
A. No. I had read the reports. You're asking me did I have them reading them perusing them as I was typing that report? No, I did not.
Q. Did you have access to those reports on May 5, 2004, the reports that they had written if you wanted to?
A. Yeah, absolutely.
Q. Okay.
A. Well, pertaining to -- let me just clarify that. Pertaining to this incident if they did anything beyond that, I didn't have any; but this report I did have access to by all means.
Q. Okay. Did Maynes agree in total with the account of the officer -- of the accounts of Burton and Campbell as to what happened on December 27, 2003?
A. Did he agree?
Q. Did he totally agree with everything that you heard Burton and Campbell say?
A. I wouldn't say he totally agreed, no.
Q. Can you remember anything that he disagreed about?
A. Yeah. The report indicates that.
Q. Show me anything in this report. I want you to note anything in that report that Maynes claims is not true about what Burton and Campbell said.





A. You're asking me to explain what they -- specifically statements they made or -- and he did not agree with?
Q. Or that he said they're wrong. Maybe I can help and put the question this way. Okay?
Would you look at Page 3?
A. Uh-huh.
Q. Actually, it comes over from the prior page. Look at the bottom of Page 2.
A. Yup.
Q. Patrolman Burton asked Maynes if he had a prescription for the pill, and Maynes indicated that he did. Maynes agreed that the conversation regarding the pill did take place and also agreed with the account of the officers' versions as well.
A. That's correct.
Q. What does that refer to?
A. The prescription, asking him if he had a prescription for pill.
Q. So that doesn't refer to the officers' complete version of what happened on December --
A. Not at all.
Q. Let me finish the question. What I just read to you does not refer to the officers' complete account of the events of December 27, 2003?

A. No, it does not.

Q. Okay. Just, I want to pursue this line of questioning for a moment, but because we brought up the pill I just -- as of December 27, 2003, would it have been illegal for Maynes to have carried a Viagra pill wrapped up in a piece of paper?

A. No, it would not.

Q. Okay. What is your understanding from Burton as to what Burton said to Maynes when Burton discovered the pill?

A. That he asked him if he had a prescription for it.

Q. Is that all?

A. Give me one second. Yes.

Q. Okay. Did Burton tell you that he said something to Maynes along the lines of, I will lose your ass in the ACI for a week because of the possession of that pill?

A. No, he did not.

Q. Okay. Would that have been an appropriate thing for an officer to have said to a detainee on the side of the road when the officer discovered a Viagra pill wrapped in a piece of paper not in the prescription container?

ATTY. COLUCCI: Objection to the form. You can answer.

A. Not at all.

Q. (By Atty. Bradley) But Burton didn't say -- admit to you that he had said anything like that to Maynes.





Right?

A. No, he did not.

Q. If he had, certainly that would have been in your report. Right?

A. Absolutely.

Q. Now, Burton didn't say anything to you about checking the license and registration of Maynes some 27 minutes before he pulled him over, did he?

ATTY. COLUCCI: Objection to the form. You can answer.

A. No, he did not.

Q. (By Atty. Bradley) Okay. And Maynes -- excuse me -- Burton didn't say anything to you about communicating with Campbell on his cell phone at approximately the time they pulled Maynes over, did he?

ATTY. COLUCCI: Objection. You can answer.

A. No, he did not.

Q. (By Atty. Bradley) Did Campbell say anything to you about talking with Burton at approximately -- on his cell phone at approximately the time that Maynes was pulled over for the roadside stop on December 27, 2003?

A. No, he did not.

Q. Okay. On Page 3 of Exhibit 1, second full paragraph, Maynes -- I'll read it. Maynes indicated that he did not disagree that the officer report indicates what took





place. What does that phrase mean?

A. It means just what it says. He indicated he didn't disagree with the officers, what they're report indicates.

Q. What report are you referring to?

A. Their -- that would be this report here, 43820F.

Q. Can I just look at what you're talking about? Is that the same as your report?

A. No.

Q. Okay.

A. There's an incident on this. That's an OF. That's a report.

Q. Yup.

A. You have an -- I'm referencing their report. In other words, Burton and/or Campbell did a report on this incident.

Q. And do you have those with you today?

A. No, I do not.

Q. Okay. What -- so you're saying that Maynes in this paragraph on Exhibit 1, second full paragraph, Maynes indicated that he did not disagree that the officers' report indicates what took place. Are you maintaining in this report that you actually aloud Maynes to read the officers' report on February 18, 2004?

A. No, I didn't.

Q. So you're representing that Maynes did not disagree





with those officers' reports, but Maynes hasn't seen them. Right?

A. Well, I went through the reports. I went through the incident with him, and he -- that's what he indicated. He didn't disagree with the officers' report indicated.

Q. Were you reading to Maynes from the reports of these officers on February 18, 2004?

A. No. I wouldn't have actually had it and read it to him. I mean, I can't say I didn't have it. I may have had it.

Q. But you did not read it to him?

A. No, I did not.

Q. But you maintain here that Maynes did not disagree with what Campbell and Burton said took place?

A. Based on what I told Maynes, that's correct.

Q. Okay. And can you tell me from this report, Exhibit 1 for identification, what those things were that you told Maynes that Maynes agreed with?

A. No. I'd have to look at this report.

Q. You'd have to look at the officers' reports?

A. Yes.

Q. Okay. Well, but you haven't brought them. I thought you said you didn't bring them with you?

A. I don't have this report, no. I brought my own report.

Q. Okay. But you are here in your -- what the phrase means on Page -- the second full paragraph of Page 3 of Exhibit 1, "Maynes indicated that he did not disagree that the officer report indicates what took place," is meant by you to mean that Maynes agreed entirely with everything that was represented in the reports of Campbell and Burton?

A. Represented by myself from the reports.

Q. Okay. Were there things that Campbell and Burton may have said in their reports that you didn't relate to Maynes?

A. I don't recall. I don't think so, but I don't recall.

ATTY. BRADLEY: I have no further questions.

ATTY. COLUCCI: No questions.

(The deposition was adjourned at 11:15 a.m.)





C E R T I F I C A T E

STATE OF CONNECTICUT:

COUNTY OF WINDHAM:

I, Jennifer Vernon, Professional Reporter and Notary Public, duly commissioned and qualified, do hereby certify that pursuant to Notice, Shawn Lacey, the witness herein, was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth of his knowledge touching and concerning the matter in controversy in this case; that he was carefully examined upon his oath and his testimony reduced to writing by me; and that the deposition is a true record of the testimony given by the deponent.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney employed by the parties thereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of June, 2005, at Plainfield, Connecticut.

Jennifer Vernon
Profession Reporter and Notary Public
My Commission Expires August 31, 2005

0
003001 [1] 58:23
02886 [1] 1:18
02891 [1] 1:15
03-17551 [1] 35:2
-17572 [1] 36:6
-17 [2] 10:10 27:15
04-276T [1] 1:5
06385 [1] 1:25
1
1 [14] 3:8 10:4 10:7 13:4 15:20 19:12 29:10 31:7 44:21 50:15 54:23 55:19 56:17 57:3
1/28/04 [1] 11:12
10:01 [1] 2:6
11:15 [1] 57:15
12/27/03 [2] 32:25 33:23
120 [1] 2:5
123 [1] 4:3
13:37 [4] 33:1 33:23 34:6 35:20
14:50 [4] 33:1 36:8 36:12 37:10
1546 [1] 37:13
15:47 [2] 36:9 36:17
16 [2] 1:24 19:12
18 [22] 10:19 10:23 11:10 11:18 12:11 12:18 14:21 16:5 45:11 45:18 45:24 46:15 46:19 47:13 19 48:2 48:10 48: 9:1 49:22 55:23
18th [13] 11:2 11:15 11:21 11:22 11:22 12:21 13:11 13:20 13:21 45:4 46:12 46:14 47:18
1998 [4] 20:2 20:12 23:9 24:6
1:37 [1] 33:1
2
2 [4] 3:9 19:8 19:11 52:9
2003 [22] 7:20 10:13 10:22 11:4 19:22 30:16 34:1 40:23 41:4 41:11 44:2 44:6 46:1 47:14 47:20 48:12 49:13 49:16 51:16 52:25 53:4 54:21
2004 [39] 9:23 10:15 10:19 10:23 10:24 11:10 11:18 11:18 12:12 12:18 12:23 14:21 15:24 16:6 27:8 29:4 29:9 31:9 45:4 45:11 45:18 45:19 45:24 45:24 46:6 46:9 46:15 46:19 47:13 47:19 48:2 48:10 48:21 49:1 49:22 50:16 51:7 55:23 56:7
2005 [6] 1:6 15:21 19:12 19:16 58: 8:23
h [1] 58:20
27 [23] 7:20 10:13 10:22 11:4 19:22 30:16 34:1 38:20 40:22 41:4 41:11 44:2 44:6 46:1 47:20 48:12 49:13 49:16 51:16 52:25 53:4 54:7 54:21
27th [2] 44:19 47:14
28 [2] 45:19 46:9
28th [7] 11:17 11:20 11:20 45:3 45:6 45:8 45:24
2:50 [2] 33:1 36:13
3
3 [11] 3:10 13:4 19:15 32:6 32:9 32:22 35:1 36:5 52:6 54:23 57:2
31 [2] 29:4 58:23
39 [1] 1:14
3:47 [1] 36:17
4
4 [3] 19:16 36:3 36:4
40-mile-an-hour [1] 43:16
4th [1] 31:12
5
5 [7] 9:23 10:15 10:24 31:9 46:6 50:16 51:6
5/4 [2] 14:10 15:1
50 [1] 43:15
52-148A [1] 2:2
530 [1] 1:18
6
6 [1] 19:16
608 [2] 17:15 18:8
8
8 [1] 1:6
9
942 [3] 20:3 20:13 20:25
[2] 1:8 1:10
A
A.m. [1] 2:6
Able [1] 15:23
Absolutely [2] 51:8 54:5
Academy [1] 39:23
Access [3] 18:15 51:6 51:12
According [5] 38:5 39:18 41:2 42:16 42:18
Account [3] 51:14 52:14 52:24
Accounts [1] 51:15
Accuracy [2] 16:5 16:12
Accurate [1] 9:24
ACI [1] 53:15
Act [3] 18:2 18:18 21:15
Action [3] 33:19 58:15 58:18
Actual [2] 34:14 37:8
Add [1] 20:22
Adhere [1] 37:21
Adjourned [1] 57:15
Admissible [1] 18:8
Admit [1] 53:24
Admits [1] 40:14
Advised [2] 14:10 42:19
Affairs [4] 10:10 27:14 27:19 27:21
Afternoon [1] 36:13
Ago [2] 5:7 5:8
Agree [5] 42:23 51:14 51:17 51:18 52:2
Agreed [5] 51:20 52:13 52:14 56:18 57:5
Agreements [1] 20:4
Ahead [1] 42:20
Al [2] 1:6 6:21
Allegation [2] 12:6 48:1
Allegations [3] 9:5 17:17 48:11
Alleged [1] 40:13
Allow [1] 22:14
Almost [1] 36:17
Alone [1] 41:2
Aloud [2] 41:21 55:22
Answer [51] 5:17 5:23 6:3 6:4 6:7 6:11 6:15 6:18 6:18 8:12 14:23 14:24 17:1 17:23 18:19 18:21 20:9 21:2 22:3 22:4 23:2 23:10 23:22 23:25 24:8 24:25 25:13 25:14 26:21 26:22 27:2 27:12 28:16 32:20 34:11 34:22 34:25 35:13 35:17 36:1 36:14 36:19 37:16 37:17 38:3 41:5 41:12 49:25 53:22 54:10 54:16
Answered [2] 5:23 6:17
Answering [1] 21:21
Anyway [2] 5:15 25:16
Appear [1] 33:11
Appeared [1] 41:24
Appreciate [2] 26:21 39:6
Approach [1] 38:8
Approached [3] 47:13 47:15 47:20
Appropriate [2] 39:19 53:17
Approximate [1] 32:25
Area [1] 17:5
Areas [3] 8:17 18:7 18:13
Argument [1] 18:5
Arrest [2] 40:15 42:19
Arrested [1] 24:19
Arrived [10] 35:10 35:12 36:8 36:12 42:17 44:1 44:5 44:9 44:12 44:14
Arthur [2] 1:6 19:21
ARVD [1] 35:9
ARVD-13:42 [1] 35:5
ARVD-13:42:00 [1] 35:6
Ass [1] 53:14
Associated [1] 20:18
Association [1] 24:6
Assume [2] 6:17 14:17
Assumed [1] 13:1
Assuming [2] 5:11 48:8
Attached [1] 3:11
Attempt [1] 12:14
Attorney [12] 5:11 5:12 6:25 7:25 8:2 8:4 8:15 9:9 20:23 38:12 58:13 58:16
Atty [153] 3:4 4:7 8:7 8:9 8:11 8:12 8:14 8:15 8:17 8:19 8:20 8:22 8:24 9:1 9:3 9:4 9:5 9:8 9:10 9:11 10:2 10:6 14:22 14:24 16:20 16:22 16:24 19:5 19:6 19:7 19:10 19:18 20:9 20:11 20:22 20:24 21:1 21:3 21:6 21:7 21:8 21:9 21:10 21:11 21:13 21:16 21:17 21:18 21:19 21:24 22:1 22:3 22:8 22:10 22:11 22:13 22:16 22:17 22:19 22:21 22:22 22:24 23:4 23:5 23:6 23:10 23:11 23:12 23:15 23:17 23:18 23:19 23:22 23:24 23:25 24:2 24:4 24:5 24:7 24:8 24:9 24:10 24:13 24:14 24:17 24:18 24:25 25:11 25:12 25:14 25:18 25:20 25:21 26:13 26:16 26:18 26:20 26:25 27:1 27:4 27:5 27:6 27:11 27:16 28:12 28:16 28:17 32:5 32:8 32:17 32:19 32:20 32:21 32:22 34:11 35:13 35:15 35:17 35:19 36:14 36:16 36:19 37:1 37:4 37:16 37:20 38:3 38:5 38:15 38:17 38:22 38:23 38:24 39:1 39:11 39:13 39:16 39:18 41:5 41:7 41:15 41:18 41:20 49:25 50:5 53:21 53:24 54:9 54:12 54:16 54:18 57:13 57:14
Audibly [1] 5:17
August [1] 58:23
Authority [1] 17:11
Auto [3] 20:25 23:9 26:12
Automobile [2] 17:7 40:8
Available [1] 13:25
Ave [1] 1:18
Aware [31] 24:11 28:5 28:7 31:9 38:11 38:14 38:17 38:23 39:1 39:7 39:12 39:13 39:17 40:12 40:13 43:2 45:3 45:13 45:18 45:22 45:23 46:4 46:8 46:12 46:12 46:13 46:21 46:25 47:12 47:12 47:19
B
Bad [1] 21:14
Baggy [1] 40:24
Baker [1] 29:4
Based [5] 17:3 20:9 23:13 26:18 56:15
Basing [1] 22:1
Basis [1] 18:9
Battle [1] 18:22
Became [2] 40:1 47:19
Become [2] 27:20 45:13
Below [1] 33:22
Best [1] 17:9
Better [1] 5:19
Between [18] 2:9 7:23 8:5 8:16 9:17 11:2 12:15 13:12 14:20 33:4 39:8 45:6 45:14 46:1 46:5 46:9 46:16 48:19
Beyond [2] 18:17 51:11
Bit [1] 5:19
Bottom [1] 52:9
Bought [4] 16:16 23:21 24:3 27:2
Bradley [82] 1:14 4:7 8:9 8:12 8:15 8:19 8:22 9:1 9:4 9:8 9:11 10:2 10:6 14:24 16:22 19:5 19:7 19:10 19:18 20:11 20:24 21:3 21:7 21:9 21:11 21:16 21:18 21:24 22:3 22:10 22:13 22:17 22:21 22:24 23:5 23:6 23:11 23:15 23:18 23:19 23:24 24:2 24:5 24:8 24:10 24:14 24:18 25:12 25:18 25:21 26:16 26:20 27:1 27:5 27:6 27:16 28:17 32:5 32:8 32:19 32:21 32:22 35:15 35:19 36:16 37:1 37:20 38:5 38:17 38:23 39:1 39:13 39:18 41:7 41:15 41:18 41:20 50:5 53:24 54:12 54:18 57:13
Bradley.................................4 [1] 3:4
Bring [9] 7:13 16:14 19:15 19:19 20:1 20:11 20:17 40:1 56:23
Broadway [1] 2:5
Brought [8] 7:10 7:12 19:23 19:24 47:16 53:3 56:22 56:24
Building [2] 26:1 26:2
Bulletin [1] 40:4
Burning [1] 21:4
Burton [64] 1:6 6:20 10:12 10:18 10:22 11:1 11:6 13:12 19:21 27:25 28:8 28:18 28:23 29:18 29:25 30:12 31:3 38:11 39:2 39:7 39:13 40:12 40:13 40:21 40:21 41:10 41:23 41:25 42:2 42:9 42:11 42:13 42:16 42:18 43:3 43:3 43:3 43:5 43:6 43:12 43:20 45:20 45:20 49:2 49:12 49:22 50:3 50:3 51:1 51:15 51:19 51:25 52:11 53:8 53:9 53:9 53:13 53:24 54:6 54:13 54:19 55:14 56:14 57:6 57:8
Burton's [2] 42:18 49:7
Buy [5] 20:24 23:9 23:24 26:11 26:12
C
C.A. [1] 1:5
Campbell [60] 10:12 10:18 10:22 11:1 11:6 13:12 19:22 27:25 28:19 28:23 29:18 30:1 30:12 31:4 39:7 39:14 40:21 40:22 42:16 44:1 44:5 44:11 44:18 44:25 45:5 45:14 45:25 46:5 46:9 46:16 46:22 47:6 47:10 47:13 47:14 47:15 47:20 47:21 47:25 48:1 48:9 48:11 49:3 49:12 49:22 50:2 50:6 50:7 50:10 50:12 51:1 51:15 51:19 51:25 54:14 54:18 55:14 56:14 57:6 57:8
Campbell's [1] 40:25
Cancelled [1] 20:6
Car [2] 27:2 38:8
Care [1] 42:15
Careful [3] 8:7 12:9 26:20
Carefully [1] 58:10
Carrera [3] 20:3 20:12 20:25
Carried [1] 53:5
Cars [1] 26:12
Case [17] 4:16 4:18 4:22 4:23 5:3 6:20 6:21 7:3 8:24 9:2 26:14 28:8 33:14 40:6 40:12 40:13 58:10
Cases [3] 4:14 4:20 6:5
Cell [6] 22:6 39:2 39:8 39:14 54:14 54:20
Certain [1] 16:15
Certainly [3] 8:25 21:14 54:3
Certainty [4] 34:23 34:25 36:2 37:17
Certified [1] 4:4
Certify [2] 58:6 58:13
Chance [1] 30:6
Change [1] 19:2
Changes [1] 40:2
Changing [1] 37:1
Characteristica

lly [1] 32:11
Charles [1] 1:14
Cheated [1] 18:11
Check [7] 28:1 28:3 28:23 31:12 38:18 39:9 42:14
[illegible]cking [2] 42:[illegible]4:7
Checks [1] 20:6
Chief [1] 29:3
Circuit [1] 17:25
Civil [4] 4:14 4:18 4:20 4:22
Civilian [2] 14:6 14:15
Claim [5] 8:7 20:15 21:3 21:8 21:14
Claiming [3] 8:9 8:13 8:15
Claims [1] 51:24
Clarification [1] 10:25
Clarify [2] 28:3 51:10
Clear [4] 17:18 17:24 18:8 27:6
Cleared [7] 36:9 36:16 36:20 36:21 36:22 36:25 37:2
Clearing [1] 37:6
Clears [2] 37:5 37:6
Client [2] 8:16 20:23
Close [1] 38:1
CLRD [2] 35:6 35:15
CLRD-14:08:00 35:7
[illegible]aine [3] 24:24 25:3 40:25
Collateral [1] 17:9
Colucci [78] 1:17 6:25 7:25 8:2 8:4 8:7 8:11 8:14 8:17 8:20 8:24 9:3 9:5 9:10 14:22 16:20 16:24 19:6 20:9 20:22 21:1 21:6 21:8 21:10 21:13 21:17 21:19 22:1 22:8 22:11 22:16 22:19 22:22 23:4 23:10 23:12 23:17 23:22 23:25 24:4 24:7 24:9 24:13 24:17 24:25 25:11 25:14 25:20 26:13 26:18 26:25 27:4 27:11 28:12 28:16 28:21 32:17 32:20 34:11 35:13 35:17 36:14 36:19 37:4 37:16 38:3 38:13 38:15 38:22 38:24 39:11 39:16 41:5 49:25 53:21 54:9 54:16 57:14
Comfortable [1] 13:7
Coming [1] 11:22
Commencing [1] 2:6
Comments [1] 17:5
Commission [1] [illegible]3
Commissioned [1] 58:5
Committed [4] 18:2 18:2 18:17 18:18
Communicating [1] 54:13
Company [2] 26:1 26:3
Complaint [9] 12:6 14:6 14:11 14:13 14:15 14:16 14:19 17:8 31:10
Complete [4] 33:3 33:7 52:20 52:24
Completed [3] 7:8 30:18 36:23
Completely [2] 13:17 18:4
Complied [1] 2:11
Concede [1] 17:14
Concern [2] 9:7 45:25
Concerned [2] 9:5 45:4
Concerning [4] 24:15 33:6 47:16 58:9
Concluded [1] 31:4
Conclusion [1] 13:5
Conduct [3] 12:4 17:16 17:21
Conducted [6] 5:10 10:18 24:11 27:17 42:3 50:20
Conducting [1] 27:7
Conflict [2] 7:19 8:2
Conflicts [5] 7:23 8:5 9:12 9:16 9:19
Confused [1] 6:16
Confusing [1] 6:10
Conjunction [8] 19:20 20:14 20:14 24:21 28:1 31:8 32:2 41:1
Connecticut [6] 1:25 2:3 2:4 2:6 58:2 58:20
Connection [1] 8:24
Conscious [1] 30:11
Consider [1] 12:10
Conspiracy [1] 9:6
Contact [1] 12:7
Container [1] 53:20
Contains [1] 35:2
CONTENTS [1] 3:1
Continuation [1] 19:13
Continued [2] 42:10 42:11
Controversy [2] 28:11 58:9
Conversation [6] 8:19 11:19 13:20 14:20 45:1 52:13
Conversations [2] 44:25 47:10
Convinced [1] 19:3
Copies [4] 20:1 20:4 20:5 20:17
Corporal [1] 29:4
Correct [40] 5:6 8:14 10:16 12:17 13:9 15:4 16:10 16:13 16:17 19:25 26:7 26:8 29:12 29:15 29:24 30:14 30:18 31:13 31:18 33:25 34:3 34:5 35:3 35:4 35:8 36:7 36:10 36:15 37:11 39:24 43:1 43:23 44:16 45:2 47:2 48:13 48:25 50:25 52:16 56:15
Counsel [2] 2:9 58:14
COUNTY [1] 58:3
Couple [2] 5:14 11:14
Courses [1] 39:25
Court [5] 1:2 5:5 6:5 18:15 41:21
Cover [1] 17:6
Covered [1] 8:18
Crime [1] 24:22
Criminal [1] 4:16
Cruiser [4] 40:25 42:10 42:11 42:19
Cumberland [1] 50:10
Cummings [1] 2:5

D

Date [5] 10:15 15:1 31:12 33:23 40:1
Dated [4] 9:23 19:16 29:4 50:16
December [26] 7:20 10:13 10:22 11:4 19:22 30:16 34:1 40:22 41:4 41:11 44:2 44:6 44:19 45:23 46:1 47:14 47:14 47:20 48:12 49:13 49:16 51:16 52:21 52:25 53:4 54:21
Decided [2] 29:13 30:11
Decision [1] 30:12
Defendants [2] 1:7 1:17
Definitely [1] 46:12
Department [22] 9:6 12:16 20:19 23:20 24:15 25:23 28:2 28:19 28:24 30:23 31:23 32:2 32:12 34:2 37:23 38:6 38:18 40:6 40:7 40:18 41:3 48:22
Department-wide [1] 9:6
Deponent [2] 2:15 58:12
Deponents [1] 6:5
Deposed [8] 4:10 4:16 4:18 4:22 7:2 7:4 9:12 9:16
Deposition [21] 1:9 2:1 2:11 2:13 2:16 5:9 6:24 7:11 7:14 17:12 18:5 18:10 18:14 19:15 19:16 19:17 22:18 27:7 57:15 58:11 58:15
Depositions [1] 5:15
Derive [1] 25:9
Destroy [2] 31:14 31:19
Destroyed [1] 31:16
Detained [1] 40:19
Detainee [1] 53:18
Detainees [1] 40:18
Determined [1] 40:22
Dictates [1] 6:6
Different [2] 18:10 33:15
Directed [2] 19:11 19:14
Directions [1] 45:20
Disagree [9] 18:6 19:3 54:25 55:3 55:20 55:25 56:5 56:13 57:3
Disagreed [1] 51:21
Discard [2] 13:22 29:13
Discarded [3] 14:19 14:25 15:2
Discovered [2] 53:9 53:19
Discussion [1] 41:17
Discussions [2] 17:3 24:14
Dispatch [7] 3:10 28:1 28:4 31:24 32:2 32:6 32:12
Dispatcher [1] 34:2
Dispatchers [1] 37:21
Dispensed [1] 40:5
DISTRICT [2] 1:2 1:3
Document [4] 10:7 31:7 31:8 36:3
Documented [1] 30:3
Documents [7] 7:5 7:7 17:2 31:22 32:1 32:9 32:10
Done [6] 19:5 21:16 23:5 30:2 49:13 50:14
Down [11] 8:21 18:11 21:20 25:15 25:17 26:14 33:22 42:3 42:10 42:13 47:9
Driscoll [1] 1:24
Drive [2] 1:24 45:21
Drug [1] 25:5
Duly [3] 4:4 58:5 58:7
Duplicate [1] 33:20
During [4] 11:7 45:25 47:15 48:12
Duties [1] 37:22
Duty [1] 50:12

E

Educational [1] 39:25
Eight [1] 22:20
Eighteen [1] 39:21
Either [16] 10:21 11:17 20:13 28:18 30:20 34:12 34:17 36:2 37:17 40:24 45:3 45:8 45:12 45:18 45:23 49:24
Employed [2] 58:14 58:17
Employee [1] 58:16
Employment [1] 25:22
End [2] 12:20 18:24
Ended [3] 44:3 44:10 44:13
Engaged [2] 29:17 38:6
Engagement [4] 46:5 46:8 46:16 46:22
Entered [1] 34:18
Entirely [1] 57:5
Entitled [2] 17:22 17:23
Entries [2] 33:11 33:15
Entry [8] 33:13 33:18 34:25 35:1 35:2 36:5 37:10 37:12
Erso [1] 45:21
Especially [1] 18:14
Esq [2] 1:14 1:17
Essence [1] 18:1
Et [3] 1:6 2:2 6:21
Events [4] 10:13 10:22 11:3 52:25
Evidence [3] 18:1 18:3 18:8
Exact [1] 15:10
Exactly [1] 34:14
EXAMINATION [2] 3:3 4:6
Examine [2] 7:4 7:7
Examined [2] 4:4 58:10
Example [2] 18:11 33:13
Except [1] 2:13
Excuse [4] 39:5 45:23 47:12 54:12
Exhibit [13] 10:4 15:20 19:8 19:10 31:6 32:6 32:9 44:21 50:15 54:23 55:19 56:17 57:3
Exhibits [2] 3:6 3:11
Exist [1] 17:2
Expires [1] 58:23
Explain [5] 5:14 6:12 22:16 42:4 52:1
Explained [3] 8:4 8:7 42:6
Explanation [1] 23:13
Expressed [1] 45:25
Extent [1] 37:24
Extrinsic [8] 17:25 18:1 18:3 18:20 18:21 21:2 21:13 21:21

F

Fact [14] 6:15 9:22 12:8 12:25 13:15 14:8 20:24 28:20 28:23 36:25 40:21 41:2 45:5 49:5
Familiar [4] 31:22 31:25 32:4 37:20
Far [1] 8:21
Farms [1] 50:10
February [31] 10:19 10:23 11:2 11:10 11:18 12:11 12:18 12:20 13:11 13:20 13:21 14:20 15:24 16:5 27:8 45:4 45:11 45:18 45:24 46:14 46:15 46:19 47:13 47:19 48:2 48:10 48:21 49:1 49:22 55:23 56:7
Federal [1] 18:14
Felt [4] 12:18 13:7 13:11 13:13
Few [2] 6:25 17:5
Filed [2] 14:5 14:19
Fill [1] 24:5
Financially [1] 58:17
Finish [2] 8:12 52:23
Fiori [1] 40:7
Fire [1] 5:4
First [9] 4:3 12:6 17:25 33:13 35:1 38:21 41:10 43:4 58:7
Five [2] 4:13 5:8
Follow-up [1] 36:24
Followed [1] 38:6
Follows [1] 4:5
Form [7] 2:14 14:15 14:16 14:22 27:11 53:21 54:9
Formal [2] 14:15 14:18
Four [7] 4:13 4:21 5:8 22:6 22:17 32:10 39:8
Framed [1] 17:17
Fraudulent [1] 22:23
Free [5] 6:9 6:10 6:12 21:22 21:24
Frontage [1] 4:3
Full [4] 15:12 54:23 55:19 57:2
Future [1] 18:22

G

Garcia [1] 32:16
General [3] 2:3 6:5 33:8
Generated [4] 20:13 31:23 32:1 51:2
Given [1] 58:12
Glad [1] 23:17
Great [1] 23:15
Greenwich [1] 1:18
Grove [1] 1:14
Guess [5] 16:23 17:4 17:22 24:25 45:21
Guessing [1] 4:21
Guy [1] 47:4
Guys [1] 11:1

H

Half [1] 39:21
Hall [3] 14:11 14:16 31:10

**Hand** [1] 58:20
**Handcuffs** [2] 42:12 42:17
**Hands** [2] 42:9 42:11
**Head** [1] 15:19
**Heading** [1] 35:20
**Headings** [1] 33:17
**Hear** [2] 13:1 13:16
**Heard** [2] 17:17 51:18
**Held** [1] 41:17
**Help** [2] 39:6 52:4
**Here,4382OF** [1] 55:5
**Hereby** [1] 58:5
**Herein** [1] 58:7
**Hereinafter** [1] 4:4
**Hereunto** [1] 58:19
**High** [1] 25:8
**Himself** [1] 40:14
**Hinchey** [1] 2:5
**History** [2] 45:13 46:4
**Holds** [1] 50:10
**Home** [2] 49:7 49:10
**Honest** [2] 30:25 44:7
**Hour** [2] 36:17 43:16
**House** [1] 5:4
**Howard** [5] 33:24 34:6 34:9 37:12
**Hypothetically** [1] 50:9

I

**Idea** [2] 31:5 44:8
**Identification** [7] 10:5 10:7 19:9 32:7 36:5 50:15 56:17
**Illegal** [2] 25:5 53:5
**Important** [1] 6:2
**Incident** [11] 7:9 13:7 19:21 34:21 36:12 37:8 46:1 51:11 55:10 55:15 56:4
**Incidents** [1] 17:16
**Including** [2] 20:3 20:5
**Income** [3] 18:12 25:9 25:22
**Inconsistent** [1] 30:7
**Indicate** [1] 14:8
**Indicated** [18] 13:6 13:7 13:10 41:23 41:25 42:2 42:9 42:20 42:21 46:3 47:3 52:12 54:24 55:2 55:20 56:4 56:5 57:3
**Indicates** [5] [illegible]2 54:25 55:3 55:[illegible] 57:4
**Indicating** [2] 6:16 11:22
**Indicia** [1] 20:5
**Information** [2] 35:2 40:5
**Initial** [1] 39:9
**Innocuous** [1] 8:20
**Inquire** [4] 17:4 17:10 17:12 17:15
**Inquired** [1] 17:25
**Inquiries** [1] 9:20
**Inquiring** [1] 17:9
**Inquiry** [1] 18:7
**Inside** [2] 41:24 42:15
**Insist** [1] 16:11
**Insisted** [1] 9:23
**Instance** [2] 17:21 41:11
**Instituted** [1] 14:4
**Instruct** [7] 17:1 18:21 23:1 25:12 25:16 26:21 26:22
**Instructed** [4] 12:7 16:18 27:1 40:18
**Instructing** [1] 26:23
**Instruction** [11] 20:22 21:1 21:10 21:11 24:1 24:4 24:7 24:13 24:17 26:13 32:17
**Instructions** [2] 23:13 42:13
**Insurance** [4] 5:12 20:15 21:3 21:8
**Intend** [1] 17:4
**Interested** [1] 58:17
**Internal** [8] 10:10 12:4 12:10 27:8 27:14 27:18 27:21 31:3
**Interoffice** [1] 29:3
**Interrupting** [1] 22:19
**Interview** [5] 12:20 15:7 29:8 29:14 30:7
**Interviewed** [1] 48:9
**Interviewing** [1] 19:20
**Interviews** [1] 10:17
**Investigated** [1] 24:21
**Investigating** [1] 48:18
**Investigation** [12] 12:1 12:4 12:11 24:11 24:16 27:8 27:15 27:17 27:19 27:21 31:3 36:24
**Investigatory** [2] 40:9 41:3
**Involved** [1] 27:24
**Involving** [2] 19:21 46:22
**Island** [8] 1:3 4:3 5:5 20:19 23:20 24:12 24:16 38:19
**Issue** [4] 17:6 17:9 17:19 18:4
**Issues** [1] 47:16
**Itself** [1] 17:19

J

**James** [1] 19:21
**January** [7] 11:18 29:4 45:3 45:8 45:19 45:24 46:9
**Jennifer** [4] 1:23 2:3 58:4 58:22
**Job** [1] 37:22
**Judge** [1] 21:12
**June** [3] 1:6 15:21 58:20
**Justify** [1] 41:3

K

**Keep** [5] 22:11 22:19 22:25 25:16 29:25
**Kept** [5] 13:23 14:20 29:14 29:20 40:14
**Kind** [5] 6:7 14:13 22:13 32:22 40:4
**Kinds** [1] 32:1
**Knowledge** [2] 17:22 58:8
**Known** [1] 36:13

L

**Lacey** [18] 1:9 2:1 4:2 4:8 8:13 8:16 8:23 9:2 9:9 10:6 19:11 19:12 19:14 19:18 23:6 24:18 41:18 58:6
**Last** [3] 8:18 13:4 47:24
**Lasted** [1] 22:6
**Law** [1] 40:2
**Lawsuit** [4] 14:4 14:5 14:8 14:12
**Lead** [1] 18:7
**Learned** [2] 28:13 28:14
**Least** [1] 11:8
**Leaves** [1] 37:7
**Lecture** [2] 23:1 23:3
**Left** [3] 35:16 37:3 40:24
**Legal** [3] 15:6 15:12 15:14
**Legitimate** [2] 6:18 18:5
**Letting** [2] 21:20 21:25
**License** [5] 18:13 38:19 39:9 54:7 58:23
**Life** [1] 18:16
**Limited** [2] 11:9 20:4
**Line** [1] 53:2
**Lines** [1] 53:14
**Listen** [2] 22:25 23:3
**Listening** [1] 42:12
**LLC** [1] 1:24
**LLP** [1] 1:17
**Log** [6] 32:24 32:25 33:4 35:23 36:1 37:25
**Logged** [1] 37:18
**Look** [10] 13:3 14:6 15:20 32:13 36:3 52:6 52:8 55:6 56:19 56:20
**Looks** [1] 19:11
**Lose** [1] 53:14
**LSR** [1] 1:23

M

**Maintain** [1] 56:13
**Maintained** [1] 43:3
**Maintaining** [5] 9:1 28:18 33:3 43:15 55:21
**Maintains** [1] 8:6
**Marijuana** [2] 25:6 40:25
**Mark** [4] 16:22 19:7 32:5 47:9
**Marked** [8] 10:2 10:4 10:6 13:4 19:8 31:6 32:6 32:8
**Material** [2] 7:10 7:12
**Materials** [3] 16:15 30:21 51:1
**Matter** [1] 58:9
**Matters** [2] 2:14 17:25
**Maynes** [124] 1:4 6:20 7:19 7:24 8:6 9:17 10:12 10:18 10:21 11:1 11:5 11:8 11:9 11:11 11:14 11:19 12:7 12:11 12:15 12:20 12:24 13:5 13:10 13:12 13:20 14:4 14:20 15:14 15:23 16:5 19:21 26:14 27:9 27:18 27:21 27:25 28:8 28:9 28:17 28:25 29:8 29:14 29:21 30:23 31:11 39:2 39:4 39:15 40:14 40:15 40:22 40:24 41:1 41:4 41:10 41:24 41:25 42:1 42:3 42:4 42:9 42:14 42:14 42:17 42:20 42:22 42:24 43:13 44:1 44:6 45:4 45:9 45:12 45:14 45:19 45:25 46:3 46:5 46:9 46:13 46:16 46:22 46:24 46:25 47:2 47:3 47:4 47:13 47:15 47:17 47:20 47:21 48:1 49:14 49:17 50:21 51:14 51:24 52:11 52:12 52:13 53:5 53:9 53:14 53:25 54:7 54:12 54:15 54:20 54:24 54:24 55:18 55:19 55:22 55:25 56:1 56:6 56:13 56:15 56:18 56:18 57:3 57:5 57:10
**Maynes'** [4] 17:8 38:19 39:9 48:11
**Mean** [19] 5:9 13:16 15:10 28:3 33:15 35:9 35:11 35:24 36:11 36:21 36:21 37:6 43:10 44:3 48:18 50:1 55:1 56:9 57:5
**Means** [4] 37:2 51:13 55:2 57:2
**Meant** [1] 57:4
**Mediate** [2] 48:17 48:19
**Mediation** [3] 27:10 27:18 31:9
**Meeting** [4] 11:20 13:5 13:6 13:21
**Memorandum** [1] 29:3
**Memory** [3] 16:4 50:17 50:23
**Michael** [2] 1:14 1:17
**Might** [5] 5:12 18:7 30:5 30:6 49:13
**Mike** [1] 17:4
**Miles** [1] 43:15
**Military** [1] 36:17
**Mills** [5] 33:23 34:1 34:6 34:9 37:12
**Minute** [1] 32:14
**Minutes** [6] 22:6 22:17 22:20 38:20 39:9 54:8
**Misrepresent** [1] 23:20
**Model** [3] 20:3 20:13 20:25
**Moment** [2] 13:3 53:3
**Money** [1] 42:16
**Months** [1] 5:8
**Morning** [3] 4:8 4:9 22:14
**Most** [1] 6:2
**Motor** [3] 20:19 23:20 38:7
**Move** [1] 42:11
**Moving** [1] 41:24
**Must** [3] 6:6 11:21 14:16

N

**Name** [1] 32:13
**Narrative** [1] 33:22
**Nationwide** [2] 5:12 5:13
**Nature** [1] 5:2
**Need** [4] 9:19 9:25 18:22 30:4
**Nervous** [1] 41:24
**Next** [3] 13:14 34:6 37:12
**Night** [1] 50:4
**Nobody** [1] 28:18
**Notary** [4] 2:4 2:12 58:5 58:22
**Note** [4] 11:18 11:21 44:24 51:24
**Notes** [25] 11:23 13:19 13:22 13:25 14:19 15:3 15:7 15:7 15:9 15:11 19:19 29:14 29:17 29:20 29:20 29:25 30:4 30:10 30:12 31:14 31:20 45:1 47:9 50:20 50:23
**Nothing** [3] 33:14 48:8 58:8
**Notice** [5] 2:10 7:14 19:15 19:17 58:6
**Noticed** [1] 5:9
**Notified** [1] 28:19
**Notify** [1] 28:24
**Number** [6] 33:18 34:6 35:2 35:19 36:6 37:13

O

**Oath** [2] 4:5 58:10
**Obey** [1] 16:18
**Object** [2] 17:1 26:21
**Objection** [35] 14:22 16:20 20:9 20:23 21:1 21:6 21:20 22:5 23:10 23:25 24:4 24:25 25:11 26:16 26:18 27:11 32:17 34:11 35:13 35:17 36:14 36:19 37:4 37:16 38:3 38:15 38:22 38:24 39:11 39:16 41:5 49:25 53:21 54:9 54:16
**Objections** [1] 2:13
**Obviously** [2] 17:7 33:1
**Occasions** [1] 45:12
**Occupation** [1] 25:10
**Off-the-record** [1] 41:17
**Offhand** [1] 40:11
**Officer** [16] 25:10 26:7 35:12 35:16 36:11 39:4 39:20 40:1 40:7 42:4 47:3 51:15 53:18 53:19 54:25 57:4
**Officers** [12] 12:15 29:18 30:20 38:1 38:7 39:1 39:7 40:18 42:21 49:2 55:3 56:7
**Officers'** [8] 52:14 52:20 52:24 55:20 55:22 56:1 56:5 56:20
**Offices** [1] 2:5
**Olenn** [1] 1:17
**Once** [2] 36:8 37:9
**One** [20] 5:1 5:10 11:2 15:12 21:7 23:25 25:1 27:7 32:9 33:18 33:18 35:5 40:11 40:23 43:15 43:18 47:21 47:23 49:24 53:12
**One's** [5] 33:19 33:19 33:19 33:19 33:20
**Opinion** [1] 18:6
**Original** [2] 3:11 3:11
**Otherwise** [3] 17:12 19:4 36:12
**Outcome** [1] 13:16
**Outset** [1] 23:14
**Outside** [2] 25:22 28:12
**Override** [1] 5:24
**Own** [3] 5:25 16:4 56:24
**Ownership** [1] 21:5

P

**Pad** [3] 15:6 15:12 15:15
**Page** [20] 3:3 3:6 13:4 15:13 19:12 19:13 19:15 19:16 19:16 35:1 36:3 36:4 36:4 52:6 52:8 52:9 54:23 57:2 57:2
**Pages** [2] 15:11 32:10
**Paid** [1] 23:21
**Paper** [4] 11:21 30:16 53:6 53:20
**Paperwork** [4] 20:12 20:17 23:21 24:5

Paragraph [5] 13:5 54:24 55:19 55:19 57:2
Parlance [1] 32:23
Part [2] 17:8 18:15
[illegible]ticipate [1] [illegible]:21
Participation [1] 27:22
Particular [2] 20:23 33:4
Parties [4] 2:9 48:19 58:15 58:17
Partners [1] 26:2
Party [3] 4:23 9:2 25:16
Pass [4] 7:22 43:25 44:4 44:12
Past [1] 9:6
Pat [3] 42:3 42:10 42:13
Path [1] 21:20
Patrolman [1] 52:11
Pay [3] 23:11 23:19 24:2
Paying [1] 22:18
Payment [1] 20:5
Penza [1] 1:17
People [2] 6:5 12:4
Perceived [1] 12:15
Perception [1] 40:23
Performing [1] [illegible]:22
[illegible]ipheral [2] 1[illegible]:9 18:4
Permit [1] 18:16
Permitted [1] 18:3
Person [1] 45:12
Person's [1] 18:16
Personal [1] 18:16
Pertaining [2] 51:10 51:11
Peruse [1] 44:7
Perusing [1] 51:4
Phone [5] 11:11 22:7 45:9 54:14 54:20
Phones [3] 39:2 39:8 39:14
Phonetic [4] 21:12 26:11 40:7 45:21
Phrase [2] 55:1 57:1
Piece [2] 53:6 53:20
Pill [9] 42:15 52:12 52:13 52:19 53:3 53:5 53:9 53:15 53:19
Place [7] 38:21 43:4 52:14 55:1 55:21 56:14 57:4
[illegible]aced [3] 42:9 [illegible]2 42:18
Plainfield [1] 58:20
Plaintiff [3] 1:4 1:14 2:2
Plaintiff's [21] 3:7 10:4 10:7 19:8 19:10 29:10 32:6 32:9 32:22 35:1 36:4
Pocket [1] 42:1
Point [11] 11:6 12:23 13:1 14:12 18:22 27:7 27:9 27:19 42:2 42:12 42:16
Points [1] 8:1
Police [27] 3:8 10:4 12:16 24:12 24:15 24:16 25:10 25:22 26:7 28:2 28:19 30:22 31:23 32:2 32:12 34:2 37:22 38:6 38:18 38:20 39:20 39:22 40:5 40:7 40:17 41:3 48:22
Policies [1] 41:2
Porsche [12] 16:16 20:2 20:12 20:25 21:4 22:15 23:9 23:21 23:24 24:3 24:6 26:11
Portion [1] 16:24
Position [1] 19:2
Positively [1] 50:8
Possession [2] 20:2 53:15
Possible [2] 30:9 38:2
Powers [1] 49:2
Practice [3] 42:5 42:6 42:7
Prepared [1] 10:9
Prescription [5] 52:12 52:18 52:19 53:10 53:20
Pretty [5] 17:18 17:18 18:23 18:25 29:6
Previous [2] 21:20 23:13
Previously [1] 17:4
Priority [1] 33:20
Privilege [3] 8:8 8:16 8:18
Problem [5] 8:21 12:15 12:15 12:19 13:11
Procedures [1] 40:8
Process [1] 22:8
Product [1] 10:17
Profession [1] 58:22
Professional [1] 58:4
Proof [1] 2:11
Proper [2] 17:11 40:8
Protocols [2] 37:21 38:5
Prove [2] 18:24 18:25
Provide [2] 17:2 29:3
Public [4] 2:4 2:12 58:5 58:22
Pull [1] 40:22
Pulled [5] 30:23 39:15 54:8 54:15 54:20
Purchase [6] 17:8 20:2 20:4 20:14 22:15 24:6
Purpose [1] 12:3
Pursuant [2] 2:2 58:6
Pursue [1] 53:2
Put [7] 22:5 26:16 30:15 34:12 47:21 47:23 52:5

**Q**

Qualifications [1] 2:12
Qualified [1] 58:5
Question's [1] 5:22
Questioning [5] 10:12 28:1 28:22 29:17 53:3
Questions [17] 12:3 16:25 18:17 21:21 22:6 22:13 22:25 23:1 27:25 29:2 33:6 33:10 33:14 47:6 49:21 57:13 57:14
Quick [1] 44:8
Quite [3] 14:6 18:8 34:13
Quotation [1] 47:24
Quotes [2] 15:14 15:17

**R**

Ran [1] 38:18
Rather [1] 8:20
Reaching [1] 42:1
Read [16] 13:14 29:5 29:6 29:9 29:13 31:1 31:1 41:20 41:21 42:24 51:3 52:23 54:24 55:22 56:8 56:11
Reading [3] 2:15 51:4 56:6
Ready [3] 23:7 41:18 41:19
Realized [1] 7:2
Really [3] 6:4 9:19 9:24
Rear [1] 42:18
Reason [4] 9:11 21:7 33:19 41:10
Reasons [2] 43:12 43:18
Received [4] 12:7 14:11 14:14 14:16
Recollection [1] 16:8
Record [9] 19:10 21:12 22:5 26:17 32:6 33:3 33:7 41:15 58:12
Records [5] 18:20 20:1 32:11 32:23 33:8
Records.......................32 [1] 3:10
Reduced [1] 58:11
Refer [6] 41:12 41:23 45:15 52:17 52:20 52:24
Referable [3] 19:20 20:2 20:15
Reference [6] 15:24 16:2 27:14 30:22 35:24 47:21
References [1] 22:22
Referencing [4] 16:9 20:12 28:6 55:13
Referred [1] 32:11
Referring [2] 16:7 55:4
Refers [1] 42:24
Refreshed [1] 16:8
Regarding [3] 7:8 10:10 52:13
Registered [1] 31:10
Registration [4] 20:18 38:19 39:10 54:7
Relate [6] 10:11 40:6 40:8 49:8 49:12 57:9
Related [1] 58:14
Relative [1] 58:16
Released [1] 42:22
Relying [1] 50:16
Remember [6] 15:17 15:23 43:20 44:11 44:18 51:21
Remskip [4] 20:25 23:9 26:12 27:3
Renato [1] 32:16
Repeat [1] 14:25
Repeating [1] 40:14
Rephrase [1] 45:7
Report [67] 7:8 7:18 7:24 8:2 8:6 9:17 9:23 10:4 10:9 10:11 10:15 10:17 10:24 11:3 13:24 14:1 14:3 14:7 14:8 15:3 15:7 15:18 15:25 16:3 16:7 16:9 16:12 19:23 27:13 29:10 30:2 30:3 30:18 31:17 31:19 31:21 41:12 41:23 44:21 46:6 48:4 48:6 48:7 50:16 51:5 51:12 51:22 51:23 51:24 54:4 54:25 55:3 55:4 55:5 55:7 55:11 55:13 55:14 55:20 55:22 55:23 56:5 56:16 56:19 56:24 56:25 57:4
Report.........................10 [1] 3:8
Reported [2] 18:12 36:11
Reporter [3] 41:22 58:4 58:22
Reporting [1] 35:12
Reports [12] 30:7 31:2 51:3 51:6 51:7 56:1 56:3 56:6 56:20 57:6 57:7 57:9
Represent [5] 8:13 34:20 35:15 35:20 37:15
Represented [2] 57:6 57:7
Representing [7] 8:10 8:22 8:25 9:8 19:14 35:11 55:25
Represents [5] 34:7 34:9 34:14 34:16 37:13
Request [2] 2:1 5:10
Requirements [1] 2:10
Reserved [1] 2:14
Residue [1] 40:24
Resist [1] 6:3
Resolve [1] 12:14
Resolved [8] 12:8 12:19 12:24 12:24 13:2 13:12 13:14 13:18
Respect [7] 10:13 11:8 21:4 49:2 49:11 49:24 50:11
Responsibilities [5] 49:2 49:8 49:11 49:24 50:11
Responsible [1] 50:5
Returns [1] 18:13
Review [1] 35:25
Reviewed [2] 30:21 51:1
Rhode [8] 1:3 4:3 5:5 20:19 23:20 24:12 24:16 38:19
RI [2] 1:15 1:18
Road [9] 4:3 8:21 25:15 25:17 26:14 28:9 28:25 30:24 53:19
Roadside [1] 54:21
Rule [4] 17:15 17:18 17:24 18:8
Rumors [1] 17:17
Run [1] 39:10
Running [1] 43:21

**S**

Safety [1] 42:4
Sake [1] 5:25
Sales [1] 20:4
Satisfied [4] 12:25 13:6 13:15 13:17
Scene [15] 35:16 36:12 36:16 36:21 36:22 37:3 37:7 42:17 42:22 44:1 44:5 44:9 44:12 44:13 45:5
School [1] 25:8
Seabreeze [1] 1:24
Search [1] 42:20
Second [7] 19:13 19:16 50:4 53:12 54:23 55:19 57:2
Section [2] 2:2 33:22
See [5] 14:7 28:23 33:20 43:7 50:14
Sent [2] 44:8 44:10
Sentence [1] 13:14
Seq [1] 2:2
Sergeant [16] 4:8 8:16 8:22 9:1 9:8 9:11 10:6 19:12 19:14 19:18 23:6 24:18 32:8 41:18 48:23 48:24
Series [1] 32:9
Served [1] 19:12
Set [2] 11:20 58:19
Several [2] 33:17 43:12
Shall [1] 2:15
Shawn [6] 1:9 2:1 4:2 8:13 19:11 58:6
Shea [1] 1:24
Shift [1] 50:4
Shorten [1] 22:8
Show [2] 44:19 51:23
Shown [1] 45:5
Side [4] 28:9 28:25 30:23 53:18
Sides [1] 20:6
Sign [4] 43:8 43:11 43:19 43:21
Signing [1] 2:15
Sit [4] 15:21 16:11 23:3 28:6
Sitting [2] 18:10 49:22
Situation [3] 48:18 48:18 48:19
Solely [2] 40:23 50:16
Solid [3] 17:18 18:23 18:25
Someone [1] 38:18
Sometimes [4] 6:4 6:7 26:20 39:5
Somewhat [2] 17:5 32:4
Somewhere [1] 39:8
Soon [1] 31:21
Sounds [1] 6:14
Source [1] 25:9
Sources [1] 25:21
Speaking [1] 38:12
Specific [3] 17:16 17:20 18:18
Specifically [1] 52:2
Speed [1] 43:15
St [1] 1:14
Stano [3] 26:6 26:11 27:2
Start [2] 5:24 35:6
Started [2] 22:5 31:7
Starting [1] 12:10
State [6] 2:4 5:5 24:12 24:16 38:19 58:2
Statement [4] 16:20 16:23 20:10 26:19
Statements [1] 52:2
STATES [1] 1:2
Station [4] 35:22 36:1 36:22 41:1
Statutes [1] 2:3
Stay [1] 36:24
Step [2] 12:6 42:3
Stick [1] 26:14
Still [1] 17:4
Stipulated [1] 2:9
STIPULATIONS [1] 2:8
Stop [19] 22:24 28:8 38:7 40:9 41:3

43:8 43:11 43:19 43:21 44:1 44:5 45:25 46:22 47:7 47:10 47:15 47:16 48:12 54:21
**Stopped** [16] 28:9 28:18 28:20 28:24 38:9 38:20 41:10 42:[illegible] 43:3 43:5 43:6 [illegible] 45:19 47:5 49:[illegible] 49:17
**Stopping** [1] 43:13
**Street** [1] 45:20
**Subpoena** [6] 16:19 16:24 17:12 19:8 19:11 19:13
**Subpoena.............................19** [1] 3:9
**Supervisor** [4] 49:5 49:9 50:3 50:4
**Supervisory** [4] 49:1 49:11 49:23 50:11
**Supposed** [3] 37:21 37:25 38:7
**Supposedly** [1] 21:14
**Sworn** [2] 4:4 58:7
**System** [5] 28:1 28:4 31:24 32:3 32:12

**T**

**TABLE** [1] 3:1
**Task** [1] 12:2
**Tax** [1] 18:12
**Temptation** [1] [illegible]
[illegible] [1] 37:10
**Terminology** [1] 12:9
**Terms** [1] 44:18
**Testified** [3] 4:5 15:2 43:12
**Testify** [2] 16:4 58:7
**Testimony** [3] 37:2 58:11 58:12
**Therefore** [1] 17:10
**Thereto** [1] 58:17
**Thereupon** [1] 4:1
**Third** [1] 36:4
**Three** [5] 4:21 12:3 32:10 37:10 39:8
**Threw** [1] 15:7
**Throughout** [1] 40:5
**Throwing** [1] 6:13
**Timed** [1] 22:6
**Title** [1] 48:21
**Today** [18] 6:24 7:4 7:11 7:13 8:13 8:25 9:9 15:21 16:11 16:14 17:10 19:3 19:15 19:19 28:6 28:6 34:4 55:16
**Together** [1] 39:[illegible]
**[illegible]ok** [8] 34:9 34:13 34:17 44:24 54:25 55:21 56:14 57:4
**Top** [1] 15:19
**Torres** [1] 21:12
**Total** [1] 51:14
**Totally** [2] 51:18 51:20
**Touching** [1] 58:9
**Town** [4] 14:11 14:16 26:15 31:10
**Traffic** [2] 44:5 47:15
**Training** [1] 39:22
**Transaction** [2] 16:15 17:7
**Transcript** [2] 2:16 3:11
**Transport** [1] 41:1
**Trial** [1] 2:14
**Trick** [1] 50:24
**Trombino** [3] 26:6 26:11 27:2
**True** [6] 9:10 16:6 37:25 46:17 51:24 58:12
**Truth** [3] 58:7 58:8 58:8
**Truthfulness** [1] 17:16
**Try** [5] 5:22 5:23 6:2 16:1 22:16
**Trying** [6] 22:8 42:13 44:17 48:17 48:19 50:24
**Turn** [1] 12:7
**TV** [2] 49:7 49:10
**Two** [3] 12:15 32:9 46:1
**Type** [2] 16:23 22:23
**Typing** [1] 51:4

**U**

**Ultimate** [1] 21:22
**Uncommon** [2] 42:5 42:7
**Under** [9] 17:15 21:4 33:22 35:1 35:20 36:5 37:9 40:15 42:19
**Understood** [4] 6:17 7:23 12:2 33:8
**Unfettered** [1] 18:15
**UNITED** [1] 1:2
**Up** [17] 11:20 16:2 21:4 37:8 40:1 41:25 44:3 44:9 44:10 44:13 44:19 45:5 45:6 47:16 50:10 53:3 53:5
**Updates** [1] 40:1

**V**

**V.I.N.** [2] 20:3 20:13
**Value** [1] 20:12
**Various** [1] 8:1
**Vehicle** [9] 20:15 20:18 38:7 38:9 41:25 42:3 42:20 42:21 44:14
**Vehicles** [2] 20:19 23:20
**Verbalize** [1] 26:23
**Vernacular** [1] 32:23
**Vernon** [4] 1:23 2:3 58:4 58:22
**Version** [1] 52:21
**Versions** [1] 52:15
**Viagra** [3] 42:15 53:5 53:19
**Violation** [2] 43:8 43:11
**Vs** [2] 1:5 6:20

**W**

**Wait** [3] 5:22 5:23 25:18
**Waive** [2] 2:15 21:19
**Waived** [1] 2:13
**Wallet** [2] 42:14 42:15
**Warwick** [1] 1:18
**Watching** [2] 49:7 49:10
**Waterford** [1] 1:25
**Week** [1] 53:15
**Welcome** [1] 23:17
**Westerly** [22] 1:15 4:3 12:16 24:15 25:10 25:22 26:7 26:15 28:2 30:22 31:23 32:2 32:12 34:2 37:22 38:6 38:18 40:5 40:6 40:17 41:3 48:22
**WHEREOF** [1] 58:19
**Whole** [1] 58:8
**Wide** [1] 9:6
**Wife** [1] 18:12
**William** [4] 1:4 19:21 26:14 44:5
**Williams** [2] 10:12 29:4
**WINDHAM** [1] 58:3
**Withstanding** [1] 14:18
**Witness** [4] 18:10 28:14 58:6 58:19
**Words** [1] 55:14
**Wrapped** [2] 53:5 53:19
**Write** [2] 15:14 50:16
**Writing** [1] 58:11
**Written** [4] 9:22 30:21 51:1 51:7
**Wrote** [14] 7:18 7:23 10:23 11:3 11:21 13:4 13:8 15:3 16:12 29:10 31:17 31:19 31:21 46:5
**WTOCA2998W83408 42** [2] 20:3 20:13

**Y**

**Years** [1] 39:21
**Yourself** [1] 12:10
**Yup** [6] 4:9 4:17 19:6 46:20 52:10 55:12

**Z**

**Zone** [1] 43:16